**In re AMERICAN FAMILY ENTER-PRISES, a Delaware general partnership, et al., Debtors and Debtors–in–Possession.**

**No. 99–41774(RG).**

United States District Court,
D. New Jersey.

Sept. 11, 2000.

Lisa J. Rodriguez of Trujillo, Rodriguez & Richards, L.L.C., Philadelphia, PA, Barry R. Himmelstein, and Elizabeth J. Cabraser of Leiff, Cabraser, Heimann & Bernstein, L.L.P., San Francisco, CA, Guy M. Burns, and Frank Jakes of Johnson, Blakely, Pope, Bokor Ruppel & Burns, P.A., Tampa, FL, and Steven Katz of Carr, Korein, Tillery, Kumin & Montroy, East St. Louis, MO, for the Plaintiff Class.

Gail B. Cooperman of the United States Department of Justice Office of the United States Trustee, Newark, NJ, for the United States Trustee.

Andrew H. Sherman of Sills Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., Newark, NJ, and Brett H. Miller of Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for the Official Committee of Unsecured Creditors.

Frederick B. Lacey and Randy Fox of Le Boeuf, Lamb, Greene & MacRae, L.L.P., Newark, NJ, for the Defendant Parties.

Frank J. Vecchione and Karen A. Giannelli of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.A., Newark, NJ, for the Debtors.

Robert E. Hannon, for Evelyn Sanborn.

Malcolm Barach, for Signe Sevigny, Arlene Anderson, and James Broccollo.

David Dykhouse of Patterson, Belknap, Webb & Tyler, New York, NY, for Time, Inc., TAF Holdings, Inc. and Time Customer Service.

Richard Price, for G.A. Ridpath.

Kadja Saldanha, pro se.

Willie Salter, pro se.

Bruce Ellis, for Vera Ellis.

## INTRODUCTION

NICHOLAS H. POLITAN, District Judge.

The following "Findings of Fact, Conclusions of Law, and Order Confirming Debtor's First Modified Joint Plan of Reorganization," ("Findings of Fact") and "Amended Final Order and Judgment" are the result of complex litigation and bankruptcy proceedings presided over by the Honorable Nicholas H. Politan of the United States District Court for the District of New Jersey. A brief background of this case is necessary in order to fully comprehend the import of the following two documents.

Numerous class actions and individual lawsuits were filed throughout the United States in late 1997 and early 1998 against American Family Publishing (now known as American Family Enterprises, and hereinafter "AFE"). The lawsuits were commenced primarily in response to a massive mailing by AFE. Plaintiffs nationwide claimed to have been deceived by these mailing, many believing they had won a sweepstakes or were otherwise entitled to large cash prizes from AFE. The plaintiffs, however, had not won and at no time did they receive cash prizes from AFE.

The first private lawsuit was filed as a class action in Tampa, Florida by Ms. Anna Brown. As a result of various other similar lawsuits, in March of 1998, Ms. Brown filed a motion in Multi–District Litigation ("MDL") proceedings to consolidate all of the federal lawsuits in one court.

The MDL judicial panel acted on Ms. Brown's motion and other motions in August of 1998, at which time there were 22 federal lawsuits, 17 of which were class actions. The MDL panel transferred all of the pending cases to Judge Politan. Judge Politan designated the class action case of *Jackson et al. v. American Family Publishing, et al.*, which was filed in his Court and was one of the earliest actions instituted, as the lead action. A number of subsequent individual actions were transferred to this Court after the MDL's consolidation and transfer of all related cases to this Court.

Thereafter, AFE filed a petition in the United States Bankruptcy Court for the District of New Jersey for a Chapter 11 Reorganization. The Chapter 11 action in the Bankruptcy Court was removed to the District Court. Joining the bankruptcy action with the consolidated class actions aided the parties and the Court in implementing the settlement agreement.

On August 9, 2000, the Court conducted a Fairness Hearing and a Bankruptcy Plan Confirmation Hearing. At such time, there were 45 separate cases as part of the MDL, 22 class actions, including 13 national class actions, two private Attorney General actions, and 21 individual actions. The appearances at the August 9, 2000 hearing were as follows:

Lisa J. Rodriguez, Esq. of Trujillo, Rodriguez & Richards, L.L.C., Barry R. Himmelstein, Esq. and Elizabeth J. Cabraser, Esq. of Leiff, Cabraser, Heimann & Bernstein, L.L.P., Guy M. Burns, Esq. and Frank Jakes, Esq. of Johnson, Blakely, Pope, Bokor Ruppel & Burns, P.A., and Steven Katz, Esq. of Carr, Korein, Tillery, Kumin & Montroy, Esqs. for the Plaintiff Class;

Gail B. Cooperman of the United States Department of Justice Office of the United States Trustee for the United States Trustee;

Andrew H. Sherman, Esq. of Sills Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A. and Brett H. Miller, Esq. of Otterbourg, Steindler, Houston & Rosen, P.C. for the Official Committee of Unsecured Creditors;

Frederick B. Lacey, Esq. and Randy Fox, Esq. of Le Boeuf, Lamb, Greene & MacRae, L.L.P. for the Defendant Parties;

Frank J. Vecchione, Esq. and Karen A. Giannelli, Esq. of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.A. for the Debtors;

Robert E. Hannon, Esq. for Evelyn Sanborn;

Malcolm Barach, Esq. for Signe Sevigny, Arlene Anderson, and James Broccollo;

David Dykhouse, Esq. of Patterson, Belknap, Webb & Tyler, Esqs. for Time, Inc., TAF Holdings, Inc. and Time Customer Service;

Richard Price, Esq. for G.A. Ridpath; and

Ms. Kadja Saldanha and Mr. Willie Salter, representing themselves, and Mr. Bruce Ellis representing his mother Vera Ellis.

At the August 9, 2000 hearing, the settlement terms and features were summarized and a thorough review of the settlement negotiations was conducted by the Court. Means of dissemination of the class notice was also discussed. In addition, reports on the claims processes administration and on AFE's financial condition were given.

Arguments concerning the approval of the proposed settlement and arguments relating to attorney's fees and costs were heard by the Court. The Bankruptcy Plan for Chapter 11 Reorganization of the Debtor was also presented.

The following Findings of Fact and Amended Final Order and Judgment resulted from the August 9, 2000 hearing.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING DEBTORS' FIRST MODIFIED JOINT PLAN OF REORGANIZATION

American Family Enterprises ("AFE"), Magazine Associates (formerly known as American Family Publishers and hereinafter referred to as "Magazine"), Mailist Associates ("Mailist") and Merchandise Associates ("Merchandise"), debtors and debtors-in-possession herein (the "Debtors"), having filed with the Court under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") a First Modified Joint Plan of Reorganization dated as of March 22, 2000 (the "Plan"),[1] and a proposed Disclosure Statement with respect thereto; and the Disclosure Statement having been approved by order of this Court dated March 23, 2000 (the "Disclosure Order"); and August 9, 2000 at 10:00 a.m. having been fixed by the Disclosure Order as the date and time of the hearing under section 1128(a) of the Bankruptcy Code (the "Confirmation Hearing") to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129 and Rule 3017(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"); and due notice of the Confirmation Hearing having been given to all known holders of Claims against the Debtors in accordance with prior Orders of the Court; and the solicitation of acceptances or rejections from holders of Claims against or Interests in the Debtors having been made in the manner required under the Disclosure Order and by applicable law; and upon the filed Declaration of Logan & Company, Inc. ("Balloting Agent") with respect to the tabulation of ballots (the "Ballots") cast in favor of and in opposition to the Plan, pursuant to LBR 3018–2 of the Local Rules of Bankruptcy Procedure for this District; and the Ballots having been filed with the Balloting Agent; and objections to confirmation of the Plan and/or the Settlement Agreement having been filed by certain holders of Individual Consumer Claims; and after reviewing the memoranda of law submitted, after hearing the arguments of counsel and individuals appearing *pro se* and considering the evidence admitted at the Confirmation Hearing, including those

---

1. Unless expressly noted otherwise, all capitalized terms not defined herein shall have the meanings ascribed to them in the Plan or the Settlement Agreement.

exhibits marked as A–1 through A–15, B–1 through B–6 and C–1 through C–11 (hereinafter "Exh. ___"); and upon the entire record properly before the Court, including the record made at the Confirmation Hearing, the Court makes the following findings of fact and conclusions of law setting forth the reasons for the Court's issuance of this Order confirming the Plan, approving the Settlement Agreement and issuing the Channeling Injunction, as described in more detail below.

## FINDINGS OF FACT [2]

### THE COURT FINDS AND DETERMINES THAT:

#### PROCEDURAL BACKGROUND

1. On October 29, 1999 (the "Filing Date"), the Debtors filed in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Thereafter, the Debtors continued to operate their respective businesses and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code as debtors-in-possession. On November 9, 1999, the United States Trustee for Region 3 appointed a Creditors' Committee. By this Court's Order dated December 6, 1999, the reference of the Chapter 11 Cases to the Bankruptcy Court was withdrawn. Docket No. 109.[3]

2. AFE is a Delaware general partnership owned equally by two general partners: TAF Holdings Inc., a Delaware corporation ("TAF"), and AFP Associates, L.L.C., a Delaware limited liability company ("AFPA"). AFE and its general partners in turn own each of the other Debtors. Exh. C–8.

3. AFE is a direct marketing holding and management company providing administrative, creative and production services to the other Debtors. It also leases office space to Magazine and Merchandise at its principal place of business in Jersey City, New Jersey. *Id.*

4. Magazine is a magazine marketing company that contracts with publishers to sell magazine subscriptions. It uses third-party providers, such as Mailist, to market magazine subscriptions. Third-party providers administer the sweepstakes contests, print and mail the promotional mailings, and perform fulfillment functions, including incoming mail processing, customer service and billing. *Id.*

5. Mailist provides a marketing vehicle for other companies, including Magazine and Merchandise, currently through sweepstakes-oriented direct mailings. *Id.*

6. Merchandise contracts with manufacturers to sell consumer products, including books, jewelry, music, and videos. Merchandise markets these products through direct mail solicitations using names from Mailist and other list sources. *Id.*

7. (a) Prior to 1998, the Debtors periodically sent uniform mass mailings to millions of individuals soliciting subscriptions to magazines and/or purchases of merchandise and announcing sweepstakes that the individuals could enter. *Id.* Copies of these mailings appear in the Court's files as exhibits to complaints, proofs of claim, responses, objections and other pleadings, and the Court takes judicial notice of these materials. All of the Debtors' mailings during the Class Period contained qualifying or conditional language as part of a winner or potential winner statement, such as "If you have and return the winning entry in time . . ." or are otherwise inherently conditional statements such as "You could be our next winner." Exh. B–2 at

---

2. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

3. Unless otherwise indicated, references to "Docket No. ___" refer to the case docket maintained by the Court under Case No. 99–41774(RG). When the dockets of other actions are referenced, they are preceded by the applicable case number.

¶¶ 1–3. All sweepstakes winners (*i.e.,* those individuals who held and timely returned a winning number) were awarded their prizes. Exh. B–1 at ¶¶ 2–4, 7. In fact, since its inception, AFE has awarded over $100,000,000 in cash prizes to more than 305,000 sweepstakes winners. *Id.* at ¶ 7.

(b) Notwithstanding the presence of conditional language requiring the timely return of the winning number in order to claim a prize, a number of consumers had sued one or more of the Debtors before 1998 alleging that (i) they had a contractual claim to recover a sweepstakes prize even in the absence of a winning number or (ii) the mailings stated that they actually held the winning number. No adverse judgments were entered against the Debtors in any of those actions. See Transcript of Confirmation Hearing (hereinafter "8/9/00 Tr. at _____") at 59–60.

(c) Beginning in early 1998, an increasing number of complaints were filed against two of the Debtors and certain other parties alleging breach of contracts to pay prize money, violations of the federal Racketeer Influenced and Corrupt Organizations Act and state consumer protection laws, and common law fraud arising from certain of the Debtors' sweepstakes mailings and billing practices (the "Business Practices Litigation"). Exh. C–8. As of the Filing Date, the Business Practices Litigation included more than 60 lawsuits pending in various forums—28 claiming to represent various classes of persons, and seeking class-action certification for more than 30 million individual consumers. The Debtors have consistently stated and reiterated at the Confirmation Hearing that they have meritorious defenses to all of the lawsuits. *Id.* at 3, ¶ 9; 8/9/00 Tr. at 58–61.

8. On August 12, 1998, the Judicial Panel on Multi–District Litigation ("MDL") issued an order transferring all federal court actions to the United States District Court, District of New Jersey (the "MDL Court") and, with consent of that court, assigning the actions to this Court.

Shortly thereafter, lead counsel for the plaintiffs was appointed by order of the MDL Court ("Lead Counsel").

9. Also in 1998, several Attorneys General initiated and/or continued proceedings against the Debtors based on certain sweepstakes mailings and related practices. As of the Filing Date, the Debtors had reached settlement agreements with 40 Attorneys General and the District of Columbia; proceedings with at least four were still pending, all of which have since been resolved. The Debtors' agreements with the Attorneys General have been incorporated into the Plan. *Id.*

10. In addition, widespread allegations of wrongful conduct in the sweepstakes industry in general sparked a Senate investigation and hearing that was held in March 1999. The House of Representatives held hearings as well. Shortly thereafter, Congress passed legislation restricting certain practices. *Id.*

11. The resultant negative publicity and economic pressures had a material adverse effect on the Debtors' businesses. *Id.* The legal costs associated with defending the Business Practices Litigation alone threatened to shutter the Debtors' operations; moreover, the damages sought in that litigation vastly exceeded the Debtors' collective net worth. *See* Exh. C–3 at 2–3, ¶¶ 3–4; Exh. C–5.

12. The Debtors filed their Chapter 11 petitions to preserve their remaining going concern values and to restructure their liabilities as fixed by the Court and to attempt to achieve global resolution of the Business Practices Litigation and the then remaining disputes with Attorneys General. Exh. C–8.

13. After more than a year and one-half of arm's-length negotiations, Lead Counsel and the Defendant Parties, including two of the Debtors, agreed to a nationwide class action settlement of the Business Practices Litigation, which has been incorporated into and made a part of the Plan. *Id.;* Exh. C–2, Exhibit 1. The settle-

ment and its implementation, which are critical to an effective reorganization, will result in, *inter alia,* extensive injunctive relief for the benefit of all Class Members and the distribution of $33 million to Subclass Members. Exh. A–2 at 26–28. This $33 million settlement fund will not be diluted by Attorneys' Fees and Costs or by the costs of the Notice Plan, all of which are being borne by the Debtors and the Funding Parties. *Id.* at 16, 26–32.

14. Pursuant to the Settlement Agreement and the Plan, all Defendants and related parties will be released from any and all claims that are or might have been made by any Class Member or any other party relating in any way to the sweepstakes mailings or other business practices of the Debtors or their predecessors in interest. Also, pursuant to the Settlement Agreement, all Class Members and other Releasing Persons are to be permanently enjoined from ever asserting any of the Released Claims against the Defendants or any of the other Released Persons. *Id.* at 32–36.

15. The Claims of the Class Representatives and all Class Members have been classified under Plan Class 6 of the Plan, which incorporates the terms of the Settlement Agreement for the satisfaction of those Claims. Pursuant to the Settlement Agreement and the Preliminary Approval Order (defined *infra* ), the Class Representatives have sought and obtained certification of the Class for settlement purposes and have filed the Class Claim. The Settlement Agreement is contingent upon Final Approval, confirmation of the Plan and issuance of the Channeling Injunction. *Id.* at 36.

16. On December 30, 1999, the Debtors filed a verified complaint for injunctive relief and applied for an order to show cause why the Court should not enjoin the commencement, continuation and/or prosecution of all judicial, administrative and other actions in which claims in the nature

of those asserted in the Business Practices Litigation and subject to the settlement thereof are brought against certain non-debtor Defendants, pursuant to sections 105 and 362 of the Bankruptcy Code and Bankruptcy Rule 7065. Adv. Proc. No. 99–4095, Docket No. 1. By Order dated January 10, 2000, the Court granted the requested relief and temporarily enjoined all actions asserting Business Practices Litigation-related claims against the non-debtor Defendants, pending confirmation of the Plan. Adv. Proc. No. 99–4095, Docket No. 21.

#### THE DISCLOSURE STATEMENT AND PLAN

17. On February 18, 2000, the Debtors filed their Joint Plan of Reorganization and related Disclosure Statement. Docket Nos. 221, 222. By order dated February 24, 2000 (the "Scheduling Order"), the Court, *inter alia,* fixed March 21, 2000 at 10:00 a.m. as the date and time of the hearing under section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3017 to determine whether the Disclosure Statement contained adequate information (the "Disclosure Hearing"). Docket No. 232. The Scheduling Order also fixed March 14, 2000 at 4:00 p.m. as the deadline for the filing and service of objections to the Disclosure Statement (the "Disclosure Objection Deadline"). Notice of the Disclosure Hearing and the Disclosure Objection Deadline was served in accordance with the Scheduling Order, including upon counsel for Arlene Andresen, James F. Broccolo and Signe Sevigny.[4] Docket No. 265.

18. On March 10, 2000, the Debtor filed a motion to approve procedures regarding the solicitation of acceptances and rejection of the proposed plan (the "Voting Procedures Motion"), which motion was made returnable at the Disclosure Hearing. Docket No. 276.

19. The Court held the Disclosure Hearing on March 21, 2000, and considered all written and oral objections there-

---

4. See pages 396–398 *infra.*

to. The Debtors advised the Court and all parties present at the Disclosure Hearing of the need to file a modified plan and disclosure statement the following day as a result of the objections and other circumstances, and detailed the modifications on the record. Transcript of Disclosure Hearing, at 26–31. As a result, the Plan and Disclosure Statement, as modified, were filed on March 22, 2000, and that Disclosure Statement was approved as containing adequate information by the Disclosure Order, which also granted the Voting Procedures Motion. Docket No. 316.

20. The Disclosure Order, *inter alia*, fixed May 5, 2000 as the last date for the filing and service of objections to the Plan (the "Plan Objection Deadline") and scheduled the Confirmation Hearing. Notice of the Plan Objection Deadline and the Confirmation Hearing (the "Confirmation Notice") was served in accordance with the Disclosure Order. *See* Docket Nos. 342–343. The Disclosure Order and the Confirmation Notice provided that, to be considered, objections to confirmation of the Plan must (a) be in writing, (b) comply with the Federal Rules of Bankruptcy Procedure and the District of New Jersey Local Bankruptcy Rules, (c) set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the Debtors, their estates or their property, (d) state with particularity the legal and factual bases for the objection, including reference to specific provisions of the Plan to which objection is made, (e) provide proposed language changes/additions to resolve the objection(s), and (f) be filed and served upon certain named parties so as to be received no later than the Plan Objection Deadline. The Disclosure Order and the Confirmation Notice explicitly provided that objections not timely filed and served as required shall not be considered and shall be deemed overruled.

21. In the Court's Findings and Order Preliminarily Certifying the Class and Subclass for Settlement Purposes, dated December 9, 1999 (the "Preliminary Approval Order"), the Court, among other things, established the applicable deadlines and procedures that Class Members must follow in order to object to the Settlement Agreement and/or Plan. Specifically, Class Members wishing to object to the Settlement Agreement were required to file written statements of their objections with the Court, and serve a copy on the Settlement Administrator, postmarked no later than May 5, 2000, and received no later than May 12, 2000. Class members wishing to object to the Plan were required to file written statements of their objections with the Court, and serve a copy upon the Balloting Agent and the U.S. Trustee, no later than May 5, 2000. Given the size and complexity of these cases and the sheer number of potential objections, the procedural and filing requirements established by the Preliminary Approval Order, the Disclosure Order and the Confirmation Notice were necessary to allow the Court to manage this litigation and were fair and reasonable to all parties. No party objected, either before or after the Disclosure Hearing, to these procedures or to the terms of the Preliminary Approval Order, the Disclosure Order or the Confirmation Notice, and no motion seeking to alter or amend the Disclosure Order was ever filed.

### THE CONFIRMATION HEARING

22. The Confirmation Hearing was held on August 9, 2000, at which time the Court also considered approval of the Settlement Agreement. Prior to the Confirmation Hearing, the Debtors, the Funding Parties, the Class Representatives, and the Defendants had filed and served proposed evidentiary exhibits and affidavits which this Court reviewed in advance of the Confirmation Hearing.

23. At the Confirmation Hearing, the Debtors, Time Inc., one of the Funding Parties, the Class Representatives (acting on their own behalf and on behalf of all similarly situated parties), the Defendants,

the Creditors' Committee, the United States Trustee, and five individual consumers (Arlene Andresen, James F. Broccolo, G.A. Ridpath, Evelyn Sanborn, and Signe Sevigny) were represented by counsel. 8/9/00 Tr. at 2–3. A number of individual consumers attended the hearing, five of whom (Gisele Dumas, Sandra L. Giura, Cecelia R. Maitland, Kadja J.B. Saldanha, and Willie J. Salter) addressed the Court on their own behalf. *Id.* at 159–169, 176–197. Bruce Ellis was permitted to address the Court on behalf of his mother, Vera Ellis, also an individual consumer creditor. *Id.* at 169. Also present in the courtroom were fact and expert witnesses, who were affiants, and appeared on behalf of the Debtors and the Class Representatives. *Id.* at 98.

24. At the Confirmation Hearing, the Court first heard arguments and presentations of counsel for the Class Representatives, for the Defendants, for the Debtors, for the Funding Parties, for the Creditors' Committee and for the United States Trustee, each of whom spoke in support of confirmation of the Plan and/or the Settlement Agreement. *Id.* at 12–101. The Debtors, the Funding Parties, the Class Representatives, and the Defendants offered into evidence all of their previously filed affidavits and exhibits plus several supplemental affidavits. *Id.* at 98. No objection was made to the admission of those documents into evidence, and the Court admitted into evidence the Class Representatives' exhibits (A–1 through A–15), the exhibits of the Defendants (B–1 through B–6), and the Debtors' exhibits (C–1 through C–11). *Id.* These parties advised the Court that witnesses were available in the Courtroom to testify or to answer questions as to the affidavits. *Id.* No party (i) objected to the proffered evidence, or (ii) asked to cross-examine or otherwise question any of the witnesses. Accordingly, without objection, this Court

accepted the proffers of testimony by the aforementioned parties. *Id.*

25. Following the presentations described above, the Court heard the presentations of counsel for Ridpath, for Andresen, Broccolo and Sevigny and for Sanborn.[5] Their objections to confirmation of the Plan will be discussed in detail hereafter.

26. Following the presentations by counsel, a number of individual Class Members spoke. Although their concerns are specifically discussed hereafter, a common theme is that the injunctive relief in favor of those consumers must be enforced. Some of these Class Members stated that the most important feature of the settlement to them was not the monetary payments to be made, but rather the injunctive provisions that will prospectively bind these Debtors in the event that the Plan is confirmed. Neither the objectors represented by counsel nor those appearing *pro se* offered any testimony, affidavits, certifications, proffers or other forms of proof in support of their positions at the Confirmation Hearing.

27. After the *pro se* presentations, the Court took the matters presented at the Confirmation Hearing under advisement.

### Factual Findings Regarding the Settlement Agreement

28. One of the conditions to Confirmation of the Plan is that the Court enter the Final Order and Judgment. That condition has been satisfied. The Court has entered the Final Order and Judgment, finding, *inter alia*, that the Settlement Agreement has been entered into in good faith and is fair, adequate and reasonable as to, and in the best interests of, each of the parties, and the Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure and approved the Settlement Agreement pursuant to Rule 9019 of the Bankruptcy Rules. *See In re Penn.*

---

**5.** The Court advised counsel for Sanborn that it would incorporate into his presentation at the Confirmation Hearing the arguments he

had made at the July 24, 2000 hearing on the Debtors' motion to reclassify certain consumer claims (the "Reclassification Motion").

*Central Transp. Co.*, 596 F.2d 1102, 1113–14 (3rd Cir.1979) (the settlement of litigation, especially in the bankruptcy context, is encouraged).

29. All of the Court's findings of fact and conclusions of law with reference to the Settlement Agreement and the Final Order and Judgment are incorporated herein.

### FACTUAL FINDINGS REGARDING THE FUNDING AGREEMENT

30. The Debtors, TAF and AFPA have insufficient assets to consummate the Plan and the Settlement Agreement. Exh. C–5; Exh. C–6; Exh. C–7; Exh. C–8 at 4, ¶ 15. If funds were not being made available by the Funding Parties, the Debtors would not have the funds to pay any portion of the Claims of Plan Classes 5, 6 and 7. TAF and AFPA, the non-debtor general partners of the Debtors, although they are liable for all of the debts of the Debtors, are themselves insolvent before the debts of the Debtors are taken into account, as demonstrated by their respective balance sheets as of June 30, 2000, and have little or no net assets that they could provide to the Debtors to make payments on account of the Claims of Plan Classes 5, 6 and 7. *Id.*

31. On November 30, 1999, AFE, on behalf of itself and the other Defendant Parties, and AFP Partners, LLC and Time Inc., as the Funding Parties, entered into the Funding Agreement, a copy of which is annexed to the Plan. Exh. C–2, Exhibit 2. In so doing, the Funding Parties were expressly acting on behalf of themselves, their Affiliates (as defined in that agreement), the other Indemnified Persons (as such term is used therein), and the other Defendants and Channeling Injunction Beneficiaries, including Ed McMahon and Dick Clark. The Funding Agreement is the essential vehicle by which the Debtors can obtain the funds needed to perform their monetary obligations under the Plan and the Settlement Agreement. Exh. C–8 at 4, ¶ 16; Exh. C–9 at 2, ¶ 2. By amendment made as of June 30, 2000, AFE and the Funding Parties amended the Funding Agreement to, among other things, provide the availability of additional funds for implementation of the Plan. *Id.*

32. The consideration being provided by the Funding Parties pursuant to the Funding Agreement, as amended, is very substantial. They are making available up to $70 million to enable the Debtors to perform their monetary obligations under the Plan and the Settlement Agreement, including establishing the Consumer Fund and paying the costs of notice and claims administration related to the settlement and the Attorneys' Fees and Costs. In addition, in the Funding Agreement, each Funding Party, acting on behalf of itself and all other Indemnified Persons related to it, waives and releases all claims against AFE under the Indemnification Agreements (as defined in that agreement) existing on the Filing Date or arising thereafter as a result of the performance by such Funding Party of its obligations thereunder. Furthermore, the Funding Parties agreed to allow the Debtors to defer payment of their secured loans, currently in excess of $45 million (Plan Class 2 Claims), until a later date.

33. Since the Class Representatives have asserted that AFE made transfers to the Funding Parties or several of their Affiliates that are avoidable under the Bankruptcy Code or state law, the Funding Parties have requested (without admitting liability), and the Funding Agreement provides, general releases by the Debtors to the Released Persons (as defined in that agreement), which include the Funding Parties and their Affiliates. Exh. C–2, Exhibit 2 at § 4.2; Exh. C–9 at 2, ¶ 4.

34. The obligations of the Funding Parties under the Funding Agreement are contingent upon Final Orders of this Court approving the Settlement Agreement and the Funding Agreement, confirming the Plan and issuing the Channeling Injunction barring all Class Members, among others, from ever asserting any of the

Released Claims against the Defendants and other Released Persons, including the Funding Parties, and upon the satisfaction or waiver of the conditions set forth in Article X of the Settlement Agreement. Exh. C–2, Exhibit 2 at § 5.2. The obligations of the Funding Parties automatically terminate upon termination of the Settlement Agreement and may be terminated by them upon a material breach of the Settlement Agreement by any of the Class Representatives or Lead Counsel. Exh. C–2, Exhibit 2 at § 5.3.

35. The releases and injunctions provided in sections 8.7, 9.2, 9.3, 11.3 and 11.5 of the Plan and in Article 4 of the Funding Agreement are integral parts of the interlocking set of compromises and settlements which are embodied in the Settlement Agreement, the Plan and the Funding Agreement. Exh. C–9 at 3, ¶ 6.

36. The funds, waivers and other value to be provided by the Funding Parties under the Funding Agreement as described above are valuable consideration, provided on behalf of all Entities for which the Funding Parties are acting in the Funding Agreement, for the releases contained in sections 8.7 and 11.3 of the Plan, Article IX of the Settlement Agreement and section 4.2 of the Funding Agreement, the injunctions described in sections 9.3, 11.3 and 11.5 of the Plan, other terms and conditions of the Plan and the other benefits of the Settlement Agreement. Such funds, waivers and other value would not be provided by the Funding Parties in the absence of such releases, injunctions and other terms, conditions and benefits. *Id.,* ¶ 7.

37. The Plan contains a provision constituting a motion for the entry of appropriate provisions in the Confirmation Order approving the Funding Agreement and all of its terms and provisions, including the releases set forth in Article 4 thereof.

38. The Funding Agreement has been entered into in good faith, provides substantial valuable consideration on behalf of all Released Parties, and is fair and rea-sonable and in the best interests of the Debtors and each Plan Class of their creditors.

39. The Funding Parties, as well as all other parties, are relying upon approval of the Settlement Agreement and the Funding Agreement, issuance of the Channeling Injunction and confirmation of the Plan, in all of their respective aspects, without change. Exh. C–9 at 3, ¶ 8.

### FACTUAL FINDINGS REGARDING THE CHANNELING INJUNCTION

40. The claims made on behalf of an exceptionally large number of people in the Business Practices Litigation amount to many millions of dollars. In that regard, these cases are extraordinary, much like those of A.H. Robins Co., Johns–Manville Corp. and Drexel Burnham Lambert Group, Inc., which were precipitated by mass-tort litigation. However, AFE and Magazine, which would bear the principal (or entire) liability thereunder if the charges were proven, have no funds available. Exh. C–5; Exh. C–6, Exh. C–7.

41. The Funding Parties have agreed to provide the funds required under the Plan and Settlement Agreement on behalf of all Released Parties. Exh. C–2, Exhibit 2. In return, among other things, they have demanded a release and the Channeling Injunction for the Released Parties, which includes the Funding Parties. Exh. C–9 at 3, ¶ 9.

42. Pursuant to the Indemnification Agreements and the Other Indemnification Agreements, the Debtors have indemnified all non-Debtor Defendants in the Business Practices Litigation, as well as the Funding Parties, their Affiliates, Ed McMahon and Dick Clark. *Id.,* ¶ 10. Based upon the evidence presented at the hearing, and after having considered the totality of the circumstances in this case, the Court concludes that the indemnity Claims of the non-Debtor Defendants under such agreements, including McMahon and Clark, are meritorious and are real and imminent. Prior to the Filing Date, the Debtors de-

fended those parties and consistently honored their obligations to them under such agreements. Exh. C–3 at 4, ¶ 6; Exh. C–4 at 2–3, ¶¶ 2–4. As set forth above, the Funding Parties' willingness to provide the approximately $70 million amount necessary to fund the Plan is contingent upon the entry of the Channeling Injunction as to *all* of the non-debtor parties, including McMahon and Clark. Much of the benefit that will accrue to the Debtors and the Funding Parties is a complete cessation of litigation so that the Debtors can concentrate their efforts on resurrecting their businesses (which have lost millions of dollars during the Chapter 11 Cases) rather than on managing litigation. 8/9/00 Tr. at 87–89. Simply put, the Funding Parties are willing to fund the settlement only for a complete and final resolution of disputes against every Defendant, not for a piecemeal settlement that only partly resolves the claims against some of the parties.

43. Accordingly, there is an identity of interest between the Debtors and the non-Debtor Defendants as well as the other Indemnitees, such that a suit against any such non-Debtor either is, in essence, a suit against one or more of the Debtors, or will otherwise deplete the assets of the Debtors' estates.

44. The Funding Agreement, as amended, and the Plan provide for the Funding Parties, on behalf of all Released Parties, to contribute substantial assets to the reorganization, well in excess of $70 million.

45. The Channeling Injunction is essential to the Debtors' reorganization because, without it and the total litigation peace that would result, the Funding Parties would contribute nothing to the reorganization. Exh. C–9 at 4, ¶ 13.

46. The creditors have overwhelmingly (100% of Plan Classes 5 and 7 and over 99.99% of Plan Class 6) voted in favor of the Plan, and thereby consented to the Channeling Injunction. Exh. C–10, Exhibit A. Less than 1% of the Plan Class 6 Class Members have filed objections to the Settlement Agreement and/or Plan. *Id.*

47. The Plan provides for the payment of all, or substantially all, of the Claims of the Plan Class or Classes affected by the Channeling Injunction. The total amount of the Plan Class 6 Claims, approximately $36 million, will be paid a total sum of $33 million (including the $1 million Automatic Special Sweepstakes), or approximately 90% of the dollar amounts of those claims. Exh. B–3 at 8, ¶¶ 22–23. The Plan also proposes to pay 100% of the Plan Class 5 and Plan Class 7 Claims.

48. The Funding Agreement, as amended, is contingent upon confirmation of the Plan and issuance of the Channeling Injunction. In the event the Plan is not confirmed or the Channeling Injunction is not issued, no funds will be provided pursuant to the Funding Agreement, as amended. In that event, in all likelihood there will be no funds available to the Debtors to pay any portion of the Claims of Plan Classes 5, 6 or 7.

49. The issuance of the Channeling Injunction will benefit all of the creditors being enjoined and is consistent with the Bankruptcy Code's goal of maximizing payments on a collective basis to all creditors.

FACTUAL FINDINGS REGARDING OBJECTIONS TO THE PLAN

50. A total of 193 objections to, comments upon, inquiries concerning the Settlement Agreement and/or Plan or claims incorrectly filed with the Balloting Agent (the "Responses") have been submitted by or on behalf of consumers and received by the Court, the Settlement Administrator, the Balloting Agent, the U.S. Trustee, and/or counsel for one or more of the parties. No individual who submitted a Response is the winner of a prize in the Debtors' sweepstakes. Exh. B–1 at ¶¶ 5–6. Copies of the Responses have been provided to the Court in four loose-leaf binders, organized and numbered alphabetically by name of author within seven

categories of places where the Responses were filed/received. The Debtors and the Class Representatives also have jointly filed with the Court spreadsheets listing all of the Responses, categorized both by the binder organization of place of filing as well as strict alphabetical order by name of author. Exh. C–11. For clarity and consistency, the Court will refer to the Responses by their numerical designations in the binders provided to the Court.

51. No Plan Class 5 claimants filed any objections to Confirmation of the Plan. Less than one-quarter of the Responses satisfy the requirements for properly objecting to the Settlement Agreement and/or Plan pursuant to the Preliminary Approval Order. Notwithstanding the failure of most of the respondents to comply with the Preliminary Approval Order, the Court has considered each Response. To the extent that any Response sets forth an objection to the Plan, all of such objections are overruled.

52. Approximately 106 of the Responses are fairly characterized as actual objections to the Settlement Agreement and/or the Plan (the "Objections"), falling under one or more[6] of the following categories:

(a) eight (8) Objections to Attorneys' Fees and Costs (Nos. 20, 21, 26, 27, 32, 34, 63 and 131);

(b) fifty-three (53) Objections to the adequacy of the Settlement Agreement based upon alleged prize(s) won (Nos. 1, 2, 5, 6, 8, 9, 13, 17, 23, 29, 31, 33, 36, 38, 41, 43–47, 51–53, 55, 58, 62, 65, 67–69, 73, 74, 77, 79, 87, 95, 96, 105, 115, 116, 121, 124, 130, 135, 137, 153, 154, 169, 170, 177, 178, 188 and 191);

(c) forty-seven (47) Objections to the adequacy of the Settlement Agreement based upon the Debtors' alleged fraud and/or misrepresentation (Nos. 4, 7, 9–11, 15, 16, 19, 21, 27, 30, 31, 36, 39, 40, 42, 43, 45, 47, 49, 50–53, 64, 66, 67, 69,

70, 74, 77, 86, 87, 90, 93, 96, 105, 121, 134, 136, 144, 148, 150, 178, 181, 187 and 188); and

(d) thirty-two (32) Objections to the specific terms or procedures embodied in the Settlement Agreement (e.g., the $40 threshold; the $5 minimum claim; asserted "opt outs" or objections to the release provisions) (Nos. 12, 18, 19, 20–22, 24, 34, 37, 43, 45, 47, 53, 67, 76, 78, 96, 110, 111, 119, 135, 140, 146, 147, 152, 158, 169, 180, 184, 185, 189 and 191). Id.

53. Of the remaining 87 Responses, a total of 49 are fairly characterized as non-objections falling within one of the following categories: 15 claimants who filed proofs of claim with the Balloting Agent but did not file an objection to either the Settlement Agreement or the Plan (Nos. 161–168, 171–176 and 193); and 34 claimants who indicate in their written communication or otherwise that they are not objecting (Nos. 14, 28, 35, 48, 54, 56, 71, 75, 80–81, 83, 88, 89, 92, 94, 99, 113, 120, 122, 143, 156, 157, 183 and 190), or that their quarrel is not with any of the Debtors but with an unrelated non-debtor (e.g., Publishers Clearing House) (Nos. 57, 123, 114, 186 and 192) or that they are actually supportive of the Debtors' business practices (Nos. 3, 72, 82 100 and 118). An additional 38 Responses indicate an "objection" to either or both of the Plan and Settlement Agreement, but state no basis for such objection or the basis for their objection is not clear and therefore, the nature of their objection is not ascertainable (Nos. 25, 59, 60, 61, 84, 85, 91, 97, 98, 101–104, 106–109, 112, 117, 125–129, 132, 133, 138, 139, 141, 142, 145, 149, 151, 155, 159, 160, 179 and 182).

54. The Court has analyzed the Objections with a view toward isolating those that state a specific quarrel with the Plan, its confirmation or the Chapter 11 Cases,

---

**6.** Some Objections are included in more than one category below. For example, approximately 19 Objections that suggest both alleged liability for sweepstakes prizes won as well as a fraud theory of liability for damages resulting from the Debtors' alleged fraudulent sweepstakes solicitations are included in both of these objection categories described below.

and has identified a total of 57 communications that arguably fall into that category. Of those, 24 are either non-objections or objections with no clear basis stated (Nos. 59, 91, 97, 98, 101–104, 106–109, 112–114, 117, 123, 125, 126–129, 141 and 149). The remaining 33 Objections (Nos. 1, 5, 6, 10, 11, 19, 20, 22, 24, 27, 33, 34, 36, 37, 41, 43–46, 49, 52, 53, 63, 69, 70, 77, 86, 87, 90, 93, 111, 124 and 178) neither articulate nor address a provision of the Bankruptcy Code or a standard of confirmation that is violated by the Plan, but instead object to the Settlement Agreement or its implementation and fall within one or more of the objection categories outlined above.

55. None of the Objections specifically addresses the authority of the Court, sitting as a court of bankruptcy, to issue the Channeling Injunction. None challenges the propriety, as a matter of law, of the Plan provisions that provide for the issuance of the Channeling Injunction or grant third-party releases. Nor do any of the Objections attempt to distinguish the facts in these cases from those cases granting similar injunctive relief.

56. In sum, there are no objections to confirmation of the Plan which are not resolved by the Court's adjudication of the fairness of the Settlement Agreement or by the Court's findings that the mandatory requirements of section 1129(a) of the Bankruptcy Code have been satisfied. The Court has disposed of the balance of the Objections (*i.e.*, those relating only to the Settlement Agreement) by its separate order regarding final approval of the Settlement Agreement.

### OBJECTIONS OF EVELYN SANBORN

57. Evelyn Sanborn ("Sanborn"), a Class Member, filed a Plan Class 5 Claim on January 21, 2000. She has been represented in these proceedings by Robert E. Hannon, Esq.

58. As indicated in the Final Order And Judgment approving the Settlement Agreement, Sanborn was mailed a copy of the Notice Packet on February 4, 2000 informing her that all objections to the proposed Settlement Agreement and/or all objections to confirmation of the Plan must be filed with the Court by May 5, 2000.[7]

59. Sanborn did not file any objection to the Settlement Agreement or confirmation of the Plan. Instead, on August 7, 2000, her attorney filed a Memorandum of Points and Authorities Re: Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Confirmation of Debtors' First Modified Joint Plan of Reorganization (the "Sanborn Brief").

60. The objections raised in the Sanborn Brief, to the extent that they constitute objections to confirmation of the Plan, are overruled as untimely.

61. Sanborn has never sought, either before the expiration of the Plan Objection Deadline or thereafter, an extension of time to allow her to assert a late-filed objection pursuant to Bankruptcy Rule 9006(b)(1). She has alleged no grounds that would constitute excusable neglect for a retroactive extension of the Plan Objection Deadline. Quite simply, Sanborn has ignored the Plan Objection Deadline and has never even attempted to offer an explanation for her tardiness in filing an objection.[8] Although this Court might more liberally excuse the failure of a *pro se* objector to strictly comply with the deadlines, Sanborn has (as noted earlier) been represented by counsel throughout these proceedings. Even in the case of *pro se* litigants who received ample notice of the Plan Objection Deadline, this Court

---

7. Bankruptcy Rule 2002(b)(2) provides for a minimum of 25 days' notice of the deadline for filing objections to confirmation. In this case, Sanborn was given more than twice that amount of time in which to object.

8. Sanborn did not request an enlargement of the time to file an objection to confirmation prior to May 5, 2000. In order to receive an extension of the deadline after May 5, she would have had (a) to file a motion and (b) show excusable neglect. Bankruptcy Rule 9006(c)(1). She has done neither.

has declined to extend the time to object to confirmation. *See, e.g.,* Docket No. 527 (Hernandez) and Docket No. 469 (Russo). It would be inappropriate to extend the Plan Objection Deadline for Sanborn in the absence of a motion.

62. The objections of Sanborn are also overruled on the merits. These objections essentially repeat the arguments she made in support of a motion she filed on or about June 14, 2000, and heard on July 24, 2000, to intervene in these proceedings, to have her claim allowed as a Plan Class 5 Claim (instead of being included in Plan Class 6) and for relief from the automatic stay so she could continue her suit against Clark and McMahon (the "July 24, 2000 Motion").

63. The Court denied the July 24, 2000 Motion in its entirety holding that (a) she had the right to be heard without the need to intervene, (b) her Claim was properly placed in Plan Class 6 since she is a Class Member and all of the Class Member Claims are treated under Plan Class 6; her Claim has no similarity to the holders of Plan Class 5 Claims, which are essentially claims for goods and services provided to the Debtors, and (c) relief from stay was inappropriate. *See* 7/24/00 Tr. at 41–42.

64. Sanborn claims that her situation is distinguishable from other Class Members because (a) she alone filed suit on her claim while the "other 35 million members of the class simply returned their sweepstakes applications"; (b) she has spent time and money, $9,805.54 in legal fees and costs,[9] (c) she had opted out of the multidistrict litigation; and (d) she did not receive adequate legal representation.

65. All of the foregoing objections have been fully addressed in this Court's findings, based upon the presentation of ample evidence, that the terms of the Settlement Agreement are fair, adequate and reasonable. The Court also explained therein why Class Members did not have the right to "opt-out," and specifically found adequacy of representation of the Class as required by Rule 23(a) of the Federal Rules of Civil Procedure. In addition, the Court finds no basis for Sanborn's allegation that she did not receive adequate legal representation since she was not entitled to separate legal representation from Lead Counsel.

66. The Court finds that Sanborn was the recipient of a uniform mass mailing sent to her and many other Class Members throughout the nation. The Court has examined the AFP Solicitation Materials appended to the various pleadings filed by Sanborn in these cases, and finds that they are similar or identical to the AFP Solicitation Materials attached to the Master Complaint, and contain similar or identical language conditioning or qualifying any representations that the recipient has won a sweepstakes prize (*e.g.,* "If you have and return the winning number, we'll say…"). *See also* Certification of Roz Racanello, Exh. B–2.

67. The claims made by Sanborn herein have been asserted on behalf of all Class Members in the Master Complaint. All of the "distinguishing" features Sanborn contends are unique to her claims are in fact common to all Class Members placed in Plan Class 6.

68. It is axiomatic that all Class Members possessing similar claims must be treated equally, and that preferential treatment of the type suggested by Sanborn and Ridpath is impermissible.

69. Moreover, numerous other plaintiffs who filed suit against AFE are in the same position as Sanborn, having themselves incurred fees and costs in connection with the filing and prosecution of their separate actions. Other Claimants who have not filed suit may have nonetheless engaged counsel to represent them in the bankruptcy case or in connection with the Settlement Agreement and/or Plan.

**9.** Sanborn Brief, at 7 through 9.

70. Sanborn has stated, without evidentiary support, that in 1998, the Debtors failed to award any sweepstakes prize, as promised. The Debtors have refuted that statement, supported by the Certification of Pamela Eagan that (a) Sanborn, as one of the objectors, was not a sweepstakes winner, and (b) all sweepstakes prizes have been awarded since AFE's inception. Exh. B–1 at ¶¶ 5, 7. Even if Sanborn were correct, she (as a non-winner) would have suffered no additional or different damages than every other Class Member.

71. Sanborn also again contends that she should be granted relief from stay to sue McMahon and Clark because AFE did not indemnify McMahon and Clark until AFE prepared to file its Chapter 11 Petition. When presented with evidence that McMahon and Clark have been indemnified by AFE for many years prior to the Filing Date, Sanborn then argued that the indemnity provisions only indemnified McMahon and Clark from materials prepared by AFE and not for materials prepared by McMahon and Clark, to wit, five mailings referred to by Sanborn, and which she alleges were prepared by McMahon and Clark. Sanborn's allegations are disposed of by the Supplemental Certification of Roz Racanello, Exh. B–5 to the effect that none of the five mailings were prepared by McMahon and Clark, but were prepared by AFE personnel.

72. The Court has elsewhere herein stated that the indemnification obligations of AFE to McMahon and Clark created an identity of interests between the Debtors and McMahon and Clark, such that a suit against them is, in essence, a suit against one or more of the Debtors. See paragraph 43, *supra.* Moreover, if Sanborn were granted relief from stay to continue her suit against McMahon and Clark, no funds will be provided pursuant to the Funding Agreement and in all likelihood there will be no funds available to the Debtors to pay any portion of the claims of Plan Classes 5, 6 or 7. See paragraph 48, *supra.* Sanborn has not provided the Court with any valid legal authority to support her request for relief from stay.

73. In summary, Sanborn's objections have no substance. Sanborn has failed to provide the Court with any relevant factual support for her objections and has failed to supply any relevant legal authority for her contentions.[10]

### OBJECTIONS OF G.A. RIDPATH

74. G.A. Ridpath ("Ridpath") has participated in the Chapter 11 Cases through his counsel, Richard B. Price, Esq. Ridpath's sole written objection in connection with the Confirmation Hearing, by his counsel, was entitled "G.A. Ridpath's Objection to Proposed Class Action Settlement" ("Ridpath Objection")[11] and filed on or about August 1, 2000. That objection was untimely for the reasons set forth below and in any event did not state any objection to the Plan whatsoever; rather, Ridpath asked the Court to "deny certification of a settlement class and reject the proposed settlement or alternatively to require the creation of a subclass comprised of claims sounding in contract and for adequate funding of any settlement provision for putative contractual claimant subclass members." Ridpath Objection at 1. Accordingly, the Ridpath Objection is more fully addressed in the Court's Final Order and Judgment on the Settlement Agreement. To the extent that the objection can

---

10. At the hearing of August 9, 2000, Mr. Hannon stated that prior to the July 24, 2000 hearings, "the Court summoned into its chambers the attorneys representing the class," without inviting Mr. Hannon. The Court said it did not remember. Upon further reflection, July 24, 2000 was a regular motion day for the Court, and while the Court may have held chambers conferences regarding other matters, no such conferences were held with any attorneys involved with the Class Action or the Chapter 11 cases. Mr. Hannon's statement was simply incorrect.

11. At the hearing on August 9, 2000, Mr. Price stated "I'm not objecting to the bankruptcy. I have no way to challenge that." 8/9/00 Tr. at 109.

be construed to relate to the Plan, it is overruled as untimely and also on the merits.

75. The Ridpath Objection was not timely filed despite ample notice to him of the Plan Objection Deadline, as well as the deadline to object to final approval of the Settlement Agreement.[12] Ridpath received notice of the Disclosure Hearing (Docket No. 265), and did not object to the adequacy of the Disclosure Statement. Ridpath was also furnished with a copy of the Court-approved Disclosure Statement and Plan, together with a Plan Class 6 Ballot. Docket No. 342. Ridpath filed no objection to confirmation prior to the Plan Objection Deadline, nor has Ridpath ever sought, either before the expiration of the Plan Objection Deadline or thereafter, an extension of the deadline to allow him to assert a late-filed objection pursuant to Bankruptcy Rule 9006(b)(1). He has alleged no grounds that would constitute excusable neglect or a retroactive extension of the Plan Objection Deadline. For the same reasons stated with reference to the untimely objections of Sanborn, it would be inappropriate to extend the Plan Objection Deadline for Ridpath in the absence of a motion.

76. Turning to the merits, Ridpath alleges no defects with respect to the Plan. His objections are limited to the terms of the Settlement Agreement, including with respect to the classification of his alleged contract claim, the adequacy of his representation by Lead Counsel, the fairness of the settlement and the adequacy of the settlement notice and claim form.[13] All of the foregoing issues are addressed above regarding the objections of Sanborn and in the Final Order and Judgment, and the Court's findings are incorporated herein. The Plan's classification of Claims is discussed and approved herein.

77. To the extent that they relate to the Plan, the objections of Ridpath thus are overruled.[14]

### OBJECTIONS OF ARLENE ANDRESEN, SIGNE SEVIGNY AND JAMES F. BROCCOLO

78. On May 4, 2000, Arlene Andresen ("Andresen"), Signe Sevigny ("Sevigny") and James F. Broccolo ("Broccolo," and together with Andresen and Sevigny, the "Andresen Claimants") filed objections (Nos. 1, 46 and 6 respectively) to the Settlement Agreement (Docket Nos. 420 and 425), and objections to confirmation of the Plan. Docket Nos. 421 and 426. The three Andresen Claimants are represented by Malcolm J. Barach, Esq., who appeared at the Confirmation Hearing on their behalf. Taken together, the foregoing objections state the following: (a) the Plan is flawed; it deprives Andresen Claimants of the right to enforce a valid claim against AFP (sic); (b) fails to address why at least one other party has not brought into the action (sic); (c) seems to permit a resolution that does not fully and fairly address the issue of fraudulent practices and procedures; and (d) the issuance of an injunction is a disservice to justice. No other objections were filed by Andresen Claimants prior to the Plan Objection Deadline.

79. Andresen Claimants have supplied no factual support for the foregoing conclusory statements; nor do they offer any legal reasoning to support those conclusions. All of these objections have been fully addressed in this Court's findings, based upon Lead Counsel's presentation of

---

**12.** The Court's comments with respect to the failure of Sanborn to file timely objections to confirmation of the Plan are equally applicable to Ridpath.

**13.** The propriety of the classification scheme in the Settlement Agreement also was raised by Ridpath in his objection to the Reclassification Motion, the hearing on which his counsel did not attend.

**14.** Ridpath's counsel stated at the Confirmation Hearing that Dick Clark, a non-Debtor Defendant, would receive "over $1 million" under the Settlement Agreement. 8/9/00 Tr. at 109–110. The Court notes that there is no evidence in the record to support that allegation.

ample evidence, that the terms of the Settlement Agreement are fair, adequate and reasonable. Accordingly, those objections are each overruled.

80. On August 8, 2000, Andresen Claimants filed a response to Debtors' memorandum in support of confirmation of the Plan and included "further objections" to confirmation. Docket No. 770. In addition to the objections mentioned above, Andresen Claimants raised the following additional objections, none of which are timely: (a) the claims of Andresen and Sevigny are not similarly situated with those of tens of thousands of consumer creditors, and their claims are improperly classified as Plan Class 6 Claims; (b) the Plan fails to meet the standard of financial disclosure; (c) the conduct of Lead Counsel constitutes a deprivation of Andresen Claimants' due process rights; (d) the Plan raises significant financial questions regarding AFP (sic) and its primary owners, as well as what role Time Inc., Time Warner and others played in the underlying issues of deception and fraud; (e) the channeling injunction should not be issued in light of the deceptive practices aspect and the Plan's obvious attempt to protect and reward Debtors' primary owners at the expense of Andresen Claimants and others; and (f) AFP (sic) and its partners should not be allowed to cut off Andresen Claimants' due process rights and to shield themselves from claims of fraud by using the Bankruptcy Code.

81. The objections raised in the foregoing response, to the extent that they constitute objections to confirmation of the Plan, are overruled as untimely for the same reasons stated with reference to the untimely objections of Sanborn and Ridpath, and they are also overruled on the merits.

82. Again, Andresen Claimants have supplied no factual support for their conclusory statements. Counsel for Andresen Claimants has not demonstrated how or why their claims are not "similarly situated" to those of the other consumer credi-

tors. Without providing any evidence, by way of affidavit or otherwise, counsel states that his clients "can prove that each had won substantial money, as asserted in their Proofs of Claim." In that regard, the Andresen Claimants assert claims similar to those of Sanborn and Ridpath; any objections to confirmation of the Plan based on those claims are overruled for the same reasons previously stated regarding the objections of Sanborn and Ridpath. *See also* the Certifications of Pamela A. Eagan and Roz Racanello, Exh. B–1 and Exh. B–2 respectively, establishing that all sweepstakes prizes have been awarded and that none of the Andresen Claimants are included among the list of sweepstakes winners supplied by Ms. Eagan.

83. Andresen Claimants do not specify how the Plan fails to meet the standard of financial disclosure. As set forth above, the Debtors first filed a disclosure statement on February 18, 2000, together with the original Plan. That disclosure statement had appended to it, among other things, several financial statements of the Debtors and their partners. Exh. C–1. Notwithstanding proper notice (Docket No. 265), Andresen Claimants did not file any objections to the Disclosure Statement nor did they appear at the Disclosure Hearing. For that reason alone, that objection is overruled. Moreover, Andresen Claimants had the right to seek additional financial information prior to the Confirmation Hearing but failed to request any such information.

84. Counsel for Andresen Claimants expanded upon his unsupported allegations that there had been inadequate disclosures concerning the Defendant Parties' financial condition and relationship with other Defendants, and suggested that the United States Trustee appoint a third party to investigate. Counsel for Andresen Claimants conceded that this objection did not appear either in his timely objection filed on May 4, 2000, or in his untimely additional objections filed the day before the Confirmation and Final Approval Hear-

ings. Counsel for Andresen Claimants sought to excuse this failure by complaining that he had been left "out of the loop" concerning the proposed settlement, but conceded that he had received the Settlement Agreement in December 1999, and that he timely received the Debtors' Disclosure Statement—which fully sets forth these matters, and on which he now bases this objection—and that he had made no effort to further inform himself about the terms of the settlement or the matters of which he now complains. Accordingly, this objection is stricken as untimely. In any event, counsel for the United States Trustee stated that no complaints were made to her office and assured the Court that she had sent a financial analyst to the Debtors' premises, reviewed their accounting practices and monthly operating reports, and was satisfied that there was no fraud, dishonesty, incompetence or mismanagement which would justify appointment of a trustee under section 1104 of the Bankruptcy Code. 8/9/00 Tr. at 141–144.

85. Counsel for Andresen Claimants also stated (without offering any support for the statement) "... on May 2nd of this year, the office of the Attorney General in Vermont issued a statement indicating that it had now settled with AFP for further violations of fraudulent claims that are post-petition." *Id.* at 122. The statement is irresponsible because it is wrong. A settlement between AFE and the State of Vermont was presented to the Court for approval on July 24, 2000. See Docket Nos. 602–604. While the State of Vermont alleged that AFE had violated a March 1998 Assurance of Voluntary Compliance (denied by AFE), there are no allegations in the documents that any of the alleged violations were "post-petition."

86. Andresen Claimants' criticism of Lead Counsel and their failure to establish a subclass that encompasses the Andresen Claimants, and the lack of an opt-out pro-

vision in the Settlement Agreement, among other things, have all been fully addressed in the Court's findings that the Settlement Agreement is fair, adequate and reasonable. All objections to the terms of the Settlement Agreement are, accordingly, overruled.

87. Lastly, Andresen Claimants' objections based on the "role Time Inc., Time Warner and others played in the underlying issues of deception and fraud and how such entities are seeking permanent injunctive relief" are also lacking in any further detail and lacking in any factual or legal support. Moreover, Lead Counsel have conducted extensive discovery and are satisfied that the roles, or the non-roles, played by those entities have been taken into account in the overall terms of the Settlement Agreement. *See* 8/9/00 Tr. at 16–28, 41–55, 123–124.

88. All of the Andresen Claimants' objections are overruled. The Court finds that they have no substance. Andresen Claimants have failed to provide the Court with any facts and has failed to supply any relevant legal authority in support of their bare allegations.

### THE PRO SE OBJECTORS

89. As noted above, six individual Class Members who were not represented by counsel addressed the Court at the Confirmation Hearing.[15] These objectors fall into three general categories. Two objectors, Cecilia Maitland (8/9/00 Tr. at 160–162) and Sandra Giura (*id.* at 162–169) stated that they were not looking for money but that their purpose in coming to Court was to ask that the Debtors' sweepstakes practices be curtailed so that consumers—particularly the elderly—not continue to be misled by the allegedly small print and strongly suggestive language that a sweepstakes prize was won.

90. An additional objector, Gisele Dumas, similarly addressed her remarks to

---

**15.** With the exception of Ms. Maitland, all of these objectors had previously filed written objections and/or other responses to the Set-

tlement and/or the Plan. These written "objections" have been addressed by the Court in paragraphs 50 through 56, *supra*.

the Debtors' sweepstakes practices, reiterating her written objection concerning the problem she had understanding the written rules as to when and by what method the sweepstakes entry form must be returned. *Id.* at 176–177.

91. As both the Court and Lead Counsel stated at the Confirmation Hearing (*id.* at 162, 178), the concerns of these three objectors have been met by the Settlement Agreement's extensive injunctive relief provisions governing the Debtors' future sweepstakes business practices. *See also* Exh. A–2 at Article VII(A). Lead Counsel also noted that he would assist Ms. Dumas in filing a claim for her estimated $1,300 refund which he asked the Court to allow as timely. 8/9/00 Tr. at 178.

92. The Court therefore finds that the objections of Cecilia Maitland, Sandra Giura and Gisele Dumas have been addressed by the provisions of the Settlement Agreement as approved by the Court and should be overruled.

93. One other objector, Bruce Ellis, on behalf of his mother, Vera Ellis, opposed the Settlement because he did not believe that it went far enough. 8/9/00 Tr. at 170. Among other things, Mr. Ellis stated that he did not believe that the injunctive relief provisions of the Settlement Agreement would be honored by the Debtors and he would prefer to see the case against the Debtors and the other defendants go to trial rather than accept the monetary award available under the Settlement Agreement and the Plan.[16] *Id.* at 175.

94. As the Court and Lead Counsel for the Class noted at the Confirmation Hearing, the injunctive relief provisions are an important aspect of the Settlement Agreement and to the extent that violations thereof by the defendants are brought to the attention of Lead Counsel, they will be presented to the Court for appropriate relief. *Id.* at 175–176. The Court finds that the belief that such injunctive relief will not be enforced is not a ground for disapproval of the Settlement or the Plan, but, instead the statements of these Class Members demonstrates the value and importance of the injunctive relief provisions of the Settlement.

95. The Court also rejects Mr. Ellis' argument that a trial of the hotly contested allegations of the Master Class Action Complaint is preferable to approval of the Settlement Agreement. As the Court has determined and set forth more particularly in the Final Order and Judgment, on the basis of the evidence contained in the record, the Court finds that the benefits of the Settlement outweigh the risks, uncertainty and costs of litigating the allegations of the Complaint. The Court therefore overrules Mrs. Ellis' objection.

96. The last two objectors, Willie J. Salter (*id.* at 179–182) and Kadja J.B. Saldanha (*id.* at 182–196), quarrel with the Settlement Agreement on the basis of multi-million dollar prizes allegedly won by them. Both vehemently stated their belief that they had actually won the sweepstakes grand prizes offered by AFE. In making their point, each brandished examples of uniform mass mailings received from AFE (indeed, the same type of uniform mass mailings received by all Class Members). For the reasons the Court noted above in overruling the objections of Sanborn, these objections, which are based upon prizes allegedly won as a result of the receipt of one or more of the Debtors' uniform mass mailings, are without merit. The objections of Mr. Salter and Ms. Saldanha [17] are therefore overruled.

---

**16.** It was pointed out by Lead Counsel that Mrs. Ellis would receive approximately $800 under the Settlement on her filed claim for a refund. 8/9/00 Tr. at 176.

**17.** Ms. Saldanha also argued that she was entitled to relief based upon a default judgment obtained against the Debtors in the Massachusetts state court. 8/9/00 Tr. at 187–188. Based upon the prior record of proceedings in this matter, including the removal and automatic stay of Ms. Saldanha's state court lawsuit, as well as other injunctive relief previously entered by the Court, the Court has denied Ms. Saldanha's motions for relief

*FACTUAL FINDINGS REGARDING THE PLAN*

97. (a) The Plan complies with the applicable provisions of the Bankruptcy Code, including, but not limited to, sections 1122 and 1123. Exh. C–8 at 4, ¶ 18. *See Kane v. Johns–Manville*, 843 F.2d 636, 648 (2nd Cir.1988). The classification of Claims and Interests complies with the law of this Circuit. *In re Jersey City Medical Center*, 817 F.2d 1055 (3rd Cir.1987); *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154 (3rd Cir.1993).

■ (b) Bankruptcy Rule 3013 permits the Court to make determinations on the classification of claims before the Confirmation Hearing. The Debtors previously filed the Reclassification Motion to reclassify and conditionally expunge various nonconforming claims of consumer creditors, including the claim of one such creditor who contemporaneously sought to have her claim placed in Plan Class 5. Docket No. 560. The Court granted the Debtors' motion by Order dated July 27, 2000. Docket No. 708. Thus, the classification issue has been extensively addressed in these Chapter 11 Cases, not only in oral argument before the Court, but in motion papers, responses and memoranda filed by the Debtors or the Class Representatives.[18] For the foregoing reasons, it is clear that the Plan satisfies the requirements set forth in section 1122 of the Bankruptcy Code. The Plan also satisfies the requirements of section 1123.

98. The Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126. Exh. C–8 at 5, ¶ 19.

■ 99. (a) The Plan has been proposed in good faith and not by any means forbidden by law. *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr.D.N.J.1988),

aff'd in part and remanded in part, 103 B.R. 521 (D.N.J.1989), *aff'd*, 908 F.2d 964 (3rd Cir.1990). The term "good faith" is not defined in the Bankruptcy Code or in the legislative history thereto. *In re New Valley Corp.*, 168 B.R. 73, 80 (Bankr. D.N.J.1994). Moreover, unless there is an objection to a plan on the record, a bankruptcy court may find good faith without the presentment of evidence at the Confirmation Hearing. *See* Fed.R.Bankr.P. 3020(b)(2) ("If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.").

■ (b) In addition to the fact that no objection to the Proponents' good faith has been filed, the evidence in the record in this matter reflects that the Debtors expeditiously negotiated separate resolutions of their differences with the Class Representatives, the Creditors' Committee and the Attorneys General. Exh. C–8 at 3, ¶¶ 10, 14. These settlements have been incorporated into the Plan, which was originally filed within the Debtors' exclusivity period. That Plan now has been almost unanimously accepted by creditors. In *New Valley*, the Court noted that there is "considerable judicial discretion" in finding good faith, with the most important feature being an inquiry into the "fundamental fairness" of the plan. 168 B.R. at 81. In these Chapter 11 Cases, the totality of the circumstances overwhelmingly demonstrates that the Plan is fundamentally fair and has been proposed in good faith.

100. The Debtors have disclosed to the Court any payments made or promised for services or for costs and expenses in connection with these cases or the Plan, and such payments have been approved by, or are subject to the approval of, the Court as reasonable.

based upon that default judgment by separate Order dated August 16, 2000. *See* Docket No. 820.

18. The Court may consider matters with which it is familiar as a result of earlier hearings herein. *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir.1986).

101. The Debtors have disclosed the identity and affiliations of the individuals proposed to serve as members of the Venture Board of AFE and as officers of the Debtors, after confirmation, and the service of such individuals is consistent with the interests of creditors and equity security holders and public policy. Exh. C–1, Exhibit E; Exh. C–8 at 5, ¶ 22.

102. The provisions of Bankruptcy Code section 1129(a)(6) are inapplicable to this case. Exh. C–8 at 5, ¶ 23.

103. With respect to each impaired Plan Class of Claims under the Plan, each holder of a Claim of such Plan Class (i) has either duly accepted the Plan, or is deemed to have accepted the Plan, or (ii) will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date and the assets of TAF and AFPA were included. Exh. C–2 at 9–11; Exh. C–5; Exh. C–6; Exh. C–7; Exh. C–8 at 5, ¶ 24; Exh. C–10, Exhibit A. The Court has reviewed (i) the consolidated balance sheet of the Debtors as at June 30, 2000, the liquidation analysis and affidavit related thereto of Houlihan Lokey Howard & Zukin, a specialty investment banking firm, by William Epstein, (ii) the balance sheet of AFPA as at June 30, 2000 and affidavit of Scott Stevens related thereto, and (iii) the balance sheet of TAF as at June 30, 2000 and affidavit of Dianne Kent related thereto. No documents or evidence of any kind have been submitted in relation or opposition to any of the foregoing. The Court is satisfied that if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, each holder of a Claim in an impaired Plan Class would receive nothing. In stark contrast, the Plan provides payments to such holders of substantially all of their Claims.

104. With respect to each Plan Class of Claims or Interests under the Plan, either such Plan Class has accepted the Plan or such Plan Class is not impaired under the Plan. Exh. C–10, Exhibit A.

105. Allowed Priority Tax Claims and Allowed Nontax Priority Claims (Plan Class 1), to the extent not previously satisfied by the Debtors, shall be paid in full in Cash pursuant to sections 3.2 and 4.1 of the Plan. Further, (i) pursuant to section 3.1(a) of the Plan, Ordinary Course Administrative Expense Claims shall be paid in full, in Cash, on the date such Claim becomes due and payable, unless such Claim is a Disputed Claim, in which case payment shall be made within ten Business Days after such Claim becomes an Allowed Claim or as otherwise agreed, and (ii) pursuant to Plan section 3.1(b), holders of Special Administrative Expense Claims shall be paid in full, in Cash, on or before the tenth Business Day following the day on which an order allowing such Claims becomes Final, or as the Court may otherwise direct. The treatment of Administrative Expense Claims, Priority Tax Claims and Nontax Priority Claims under the Plan complies with the provisions of Bankruptcy Code section 1129(a)(9).

106. At least one impaired Plan Class of Claims has accepted the Plan, as determined without including any acceptance of the Plan by any insider holding a Claim in such Plan Class.[19]

107. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors. Exh. C–8 at 6–7, ¶ 28.

108. All fees payable under section 1930 of title 28 of the United States Code have been paid or the Plan provides for the payment of all such fees on the Effective Date or as soon as practicable thereafter. Exh. C–2 at 8; Exh. C–8 at 7, ¶ 29; 8/9/00 Tr. at 92.

19. Actually, all impaired Plan Classes have accepted the Plan.

109. The provisions of Bankruptcy Code section 1129(a)(13) are inapplicable to this case. Exh. C–8 at 7, ¶ 30.

110. The procedures by which the Ballots were tabulated were fair, properly conducted, and complied with the Disclosure Order.

### CONCLUSIONS OF LAW

111. The Court has original and exclusive jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and original, but not exclusive, jurisdiction of all civil proceedings arising in or related to this case under Title 11 pursuant to 28 U.S.C. § 1334(b). That statute confers upon the Court jurisdiction to issue the Channeling Injunction that will result upon confirmation of the Plan, as that injunction arises in and/or is related to these Chapter 11 cases. *See Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984) (a proceeding is related to a bankruptcy case if the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy).

112. Venue is proper in this district pursuant to 28 U.S.C. § 1408.

### BEST INTERESTS OF CREDITORS (THE "FAIRNESS TEST")

113. Section 1129(a)(7) of the Bankruptcy Code requires that:

> [w]ith respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7). This subsection focuses on individual creditors rather than on classes of claims or interests. *See In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 150 (Bankr.S.D.N.Y.1984).

114. It is a plan proponent's burden to prove that the plan complies with section 1129(a)(7). *In re MCorp Financial, Inc.,* 137 B.R. 219, 228 (Bankr. S.D.Tex.1992), *appeal dismissed and remanded,* 139 B.R. 820 (S.D.Tex.1992). The Debtors have met that burden by showing that creditors will receive at least as much under the Plan as they would receive in a liquidation of the Debtors' assets under chapter 7. *In re Resorts Int'l, Inc.,* 145 B.R. 412, 477–478 (Bankr.D.N.J. 1990). In making such a showing, the liquidation value of the debtor's assets is controlling. *See id.* Moreover, the costs of a chapter 7 case must also be taken into account. *In re Montgomery Court Apartments,* 141 B.R. 324 (Bankr.S.D.Ohio 1992).

115. The Court has also reviewed the provisions of section 723 of the Bankruptcy Code to the extent that the assets of TAF and AFPA should also be taken into consideration with reference to the Fairness Test. The Court is satisfied after reviewing the affidavits and other evidence presented that the Plan has satisfied all of the requirements of section 1129(a)(7), including the provisions of section 723.

### ACCEPTANCE OF PLAN BY CREDITORS

116. Section 1129(a)(8) of the Bankruptcy Code requires, as a condition to confirmation, that each class of claims and interests has either accepted the plan or is not impaired thereunder. 11 U.S.C. § 1129(a)(8). Bankruptcy Code section 1126(c) supplies the test for acceptance of a plan by a class of creditors:

> A class of claims has accepted a plan if such plan has been accepted by creditors...that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors...that have accepted or rejected such plan.

11 U.S.C. § 1126(c). A plan is accepted by classes of interests if it receives favorable votes from the holders of at least two-thirds in amount of the allowed interests of such class. 11 U.S.C. § 1126(d). Bank-

ruptcy Code section 1126(f) specifies that unimpaired classes are "conclusively presumed" to have accepted a plan while classes that receive or retain nothing under a plan are deemed to have rejected such a plan under Bankruptcy Code section 1126(g). *See In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1267 (10th Cir.1988).

117. Plan Classes 1, 2, 3, 4 and 8 are unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan. Plan Classes 5 and 7 have unanimously (100% of ballots cast) voted in favor of the Plan. There is legal support to the effect that Plan Class 6 is unimpaired inasmuch as the Settlement Agreement establishes the legal, equitable and contractual rights of all Class Members and the Plan gives Plan Class 6 precisely the consideration established by the Settlement Agreement. *See In re Drexel Burnham Lambert Group, Inc.,* 130 B.R. 910, 928 (S.D.N.Y.1991), *aff'd,* 960 F.2d 285 (2nd Cir.1992). Nevertheless, the Plan herein allowed the Class Members in Plan Class 6 to vote and stated that if the necessary majorities vote to accept the Plan, the issue of impairment will be moot.

 118. In prior orders, the Court authorized and directed the Debtors to notify Plan Class 6 creditors that, among other things, they needed to do nothing further if they wished to accept the Plan, because the Class Representatives would vote the Class Claim in favor of the Plan absent the filing of ballots by individual Class Members.[20] That notice also resulted in the filing of more than 138,000 Plan Class 6 claims; of those creditors only *nine* rejected the Plan. The great majority of these claimants permitted the Class Representatives to accept the Plan on their behalf.

119. Following the balloting deadline, the Balloting Agent reported that the individual Class Members had voted by the necessary majorities in favor of the Plan even without including the ballot submitted on behalf of the Class Members. With the inclusion of that ballot, over 99.9% of Plan Class 6 claimants have voted in favor of the Plan. Therefore, the issue of Plan Class 6 impairment is moot. The Plan has been accepted by *all* Plan Classes and all of the requirements of section 1129(a)(8) have been satisfied.

**THE FEASIBILITY TEST**

 120. In order to comply with section 1129(a)(11) of the Bankruptcy Code, the proponents of a plan must establish that:

> confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" test, usually encompasses two interrelated determinations—(i) a finding that the debtor will be able to make all payments under and comply with the provisions of the plan, and (ii) a finding that the plan provides reasonable assurances that the debtor will remain viable for a reasonable time. *See In re Sound Radio, Inc.,* 103 B.R. 521, 522 (D.N.J.1989).

 121. The Court is satisfied that the Plan is feasible. The financial distress of the Debtors has been caused mainly as a result of the Business Practices Litigation and the proceedings commenced by the Attorneys General of various states. The Debtors have resolved all of the state attorneys general proceedings and, with the consummation of the Settlement Agreement, the Debtors will have eliminated the root cause of the bankruptcy filing and will have achieved complete litigation peace. Based upon the affidavits filed and the other evidence produced, all of the

---

**20.** The Class Representatives, acting through Lead Counsel, may vote on behalf of all Class Members who have not voted individually to accept or reject the Plan. *In re Mortgage & Realty Trust,* 125 B.R. 575, 583 (Bankr. C.D.Cal.1991).

requirements of section 1129(a)(11) have been satisfied.

### THE CHANNELING INJUNCTION

#### A. *Background*

■ 122. Section 105 of the Bankruptcy Code grants the Court broad equitable power to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of Title 11. Section 1123(b)(6) states that a plan may include any appropriate provision not inconsistent with the applicable provisions of Title 11.

123. The Plan contains detailed provisions that protect the Funding Parties and other Released Persons, non-debtors herein. In consideration for inclusion in the Confirmation Order of language which, *inter alia*, channels all consumer claims to the $33 million Consumer Fund and provides for a permanent injunction (the "Channeling Injunction") against the pursuit of any creditors' Claims (including consumer claims) against them, these parties will provide up to $70 million to fund the Debtors' obligations under the confirmed Plan. Out of these funds, $33 million will be set aside to fund the settlement with members of the class of individual consumers (Plan Class 6 claimants). In addition, the third parties will release or forebear from pursuing various indemnification claims that they have against the Debtors, and the Funding Parties will defer repayment to them of secured claims in excess of $45 million.

124. No general unsecured creditors (Plan Class 5 claimants) filed any objection to confirmation. As noted earlier, more than 138,000 consumers have filed claims for refunds under the proposed settlement and, by virtue of the Class Representatives' ballot cast in accordance with earlier orders of this Court, more than 99.9% of these consumers have accepted the Plan in its entirety, including the grant of the Channeling Injunction and the releases. Only a relative handful of these consumers have "objected" to the Plan, and the Court has summarized earlier in this Order all of these Responses, many of which were hand-written.

#### B. *Jurisdiction*

■ 125. As noted earlier, the Court unquestionably has jurisdiction to consider and confirm the Plan pursuant to 28 U.S.C. § 1334(b). That statute also confers upon the Court jurisdiction to issue the Channeling Injunction that will result upon confirmation of the Plan, as that injunction arises in and/or is related to these Chapter 11 Cases. *See Pacor, Inc. v. Higgins, supra*, 743 F.2d at 994. *See also Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (citing *Pacor* with approval and upholding the jurisdiction of a bankruptcy court to enjoin a creditor of a chapter 11 debtor from collecting on a supersedeas bond posted by a non-debtor surety);[21] *Core-States Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 204 (3rd Cir.1999).

126. The Settlement Agreement is conditioned upon confirmation of the Plan and issuance of the Channeling Injunction. As stated in paragraph 55 above, none of the Objections specifically addressed the authority of this Court, sitting as a court of bankruptcy, to issue the Channeling Injunction. None challenged the propriety, as a matter of law, of the Plan provisions that provide for the issuance of the Channeling Injunction or the granting of the third-party releases. Nor did any of the Objections attempt to distinguish the facts in this case from those cases granting similar injunctive relief. None of the Objections contains a citation of any authority which stands for the proposition that an injunction or a release would be improper under the facts and circumstances present

---

**21.** Even the dissent in *Celotex* acknowledged that suits by creditors against third parties, such as guarantors, could have "some effect" on the administration of the bankruptcy case and were thus within the court's jurisdiction. 514 U.S. at 318 n. 5, 115 S.Ct. 1493.

here. In fact, such injunctions and releases are customary and ordinary in large Chapter 11 cases, particularly those dealing with "mass torts" similar to those alleged in the Class Claim. *See, e.g., In re Lykes Bros. Steamship Co., Inc.,* 233 B.R. 497, 514, 532–533 (Bankr.M.D.Fla.1997); *In re Celotex Corp.,* 204 B.R. 586, 609–610 (Bankr.M.D.Fla.1996); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 754, 772 (Bankr.S.D.N.Y.1992).

■ 127. In *Celotex,* for example, the court found it had the "inherent constitutional and statutory power and authority" to issue the discharges, releases and injunctions provided for in the plan and confirmation order, which provisions are similar to those incorporated into the Plan herein. 204 B.R. at 609. The issuance of the Channeling Injunction is a prerequisite to the administration of these cases, including the processing of tens of thousands of claims, and to the formulation and consummation of the Plan, which is a consensual plan. The Funding Parties will, subject to satisfaction of the conditions contained in the Funding Agreement, forbear from enforcing their liens against property of the Debtors' estates and provide new funds to the Debtors which will become property of their estates and allow them to consummate the Plan. For the reasons that follow, this Court holds that, under the facts of these pending cases, the Court has the power and authority to issue the Channeling Injunction, and the same is hereby approved.

### C. Basis for Issuance of the Injunction

128. The legal conclusions reached by the Court are supported by a long line of cases dealing with "exceptional or extraordinary circumstances" similar to the exceptional, or unusual, circumstances found in these cases. Those courts which have approved the issuance of permanent injunctions and third-party releases have dealt with unusual cases such as mass tort claims, the resolution of which was reasonable, in the best interests of all parties, and which channeled all such claims to a particular fund provided in whole or in part by third parties. *See MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89 (2nd Cir. 1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (permanent injunction protected insurance company from suits as part of a settlement wherein insurer contributed large sums of money to fund plan and pay claimants); *Menard–Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694 (4th Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (approving permanent injunction which protected insurer, members of Robins family, present and former officers and directors and certain doctors, based in part upon payments made by some of them and in part upon some of them holding indemnification rights against the debtor);[22] and *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285 (2nd Cir. 1992), *cert. dismissed sub nom., Hart Holding Company v. Drexel Burnham Lambert Group, Inc.,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993) (releases and permanent injunction issued in favor of Michael Milken and 200 former Drexel employees).

129. As in *Celotex, A.H. Robins, Johns–Manville* and *Drexel,* the discharges, releases, and injunctions provided in the Plan are essential to the Debtors' reorganization and are a condition precedent to the payment of substantial amounts to general unsecured creditors and consumer claimants that would not otherwise be

---

**22.** The Third Circuit Court of Appeals has expressly adopted the earlier (and very similar) decision of the Fourth Circuit in *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), which enjoined the pre-confirmation prosecution of claims against non-debtor third parties. *See McCartney v. Integra National Bank North,* 106 F.3d 506 (3rd Cir.1997). In the case at bar, the continuation of the injunction *post*-confirmation is clearly warranted.

available; liquidation of the Debtors' assets would yield *no* return to unsecured creditors. Denial of the Channeling Injunction would frustrate and undermine the Debtors' reorganization efforts.

■■■■■ 130. The rationale supporting such permanent (or channeling) injunctions is best described in *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.W.D.Mo.1994), where the court listed the factors considered by those courts approving permanent injunctions to include:

an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

the non-debtor has contributed substantial assets to the reorganization;[23]

the injunction is essential to the reorganization. Without it, there is little likelihood of success;

a substantial majority of the creditors agree to such injunction, specifically the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and

the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

168 B.R. at 935.

131. In addition to the Second and Fourth Circuits, other Circuit Courts of Appeals which have adopted the rationale of the foregoing cases, or which have otherwise enforced third party releases in a plan of reorganization, include *In re Specialty Equipment Companies, Inc.*, 3 F.3d 1043 (7th Cir.1993); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987); *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir.1995); *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C.Cir.1986); and *Matter of Munford, Inc.*, 97 F.3d 449 (11th Cir.1996) (section 105(a) and Fed.R.Civ.P. 16 taken together provide ample authority for issuance of permanent injunction in aid of settlement). *See also In re Labrum & Doak, LLP.*, 237 B.R. 275, 305–308 (Bankr. E.D.Pa.1999); and *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 825 (S.D.Ohio 1998).[24]

132. All of the factors set forth in *Master Mortgage*, as described above, are present in this case and have been fully satisfied. *See* the Factual Findings Regarding The Channeling Injunction, *supra*, particularly paragraphs 43 through 48.

133. *Master Mortgage* also refers to those cases advocating an opposing point of view, including *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th

---

**23.** A contribution need not be made by each and every non-debtor beneficiary of a release or channeling injunction under a plan; rather, contributions may be made on their behalf. *See In re A.H. Robins Co., Inc.*, 88 B.R. 742 (E.D.Va.1988), *aff'd*, 880 F.2d 694 (4th Cir.), *cert. denied, Menard–Sanford v. A.H. Robins Co., Inc.*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (injunction protected, among others, non-contributing directors and attorneys for the debtor); *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 640 (2nd Cir.1988) (debtor's non-debtor operating affiliates and certain other "specified" persons not identified in the opinion were protected by the injunction notwithstanding no contribution).

**24.** Neither the Third Circuit of Appeals nor the District Court of New Jersey has ruled on the merits of a channeling injunction in a Title 11 case. The Third Circuit recently discussed the issue, but stated that it need not reach any conclusions in the matter before it:

Given the manner in which the issue has been presented to us, we need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible. Establishing a rule would provide guidance prospectively, but would be ill-advised when we can rule on Plaintiff's appeal without doing so.... The hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions—are all absent here.

*In re Continental Airlines*, 203 F.3d 203, 214 (3rd Cir.2000).

Cir.1990), as amended, *Abel v. West*, 932 F.2d 898 (10th Cir.1991); and *In re American Hardwoods, Inc.*, 885 F.2d 621, 625 (9th Cir.1989). *See also, In re Lowenschuss*, 67 F.3d 1394 (9th Cir.1995).[25] However, a careful reading of those cases reveals they are distinguishable and none of them involve any "unusual or extraordinary circumstances" nor any of the factors referred to in *Master Mortgage.* In *American Hardwoods*, where the Debtor sought a permanent injunction to protect guarantors who made no contribution of funds, the court denied that relief and specifically distinguished its holding from *Robins* (and the *Master Mortgage* factors), stating that "American's bankruptcy proceeding presents no such unusual facts." 885 F.2d at 626–627.

134. This Court, as did the court in *Master Mortgage*, and for the same reasons, finds the holding therein more persuasive, and concludes that this Court has the authority to issue the Channeling Injunction and approve the third-party releases. *Master Mortgage*, 168 B.R. at 936.[26]

135. The Funding Parties are prepared to contribute over $70 million to consummate the Plan, but only if the Channeling Injunction is issued. Without the Channeling Injunction, the settlement will fail and all creditors would face a serious risk of not recovering any money from the Debtors or the non-Debtor Defendants in the Class Action.

■ 136. Therefore, the Channeling Injunction will be entered pursuant to this Court's authority under section 105 of the Bankruptcy Code to enter such orders as are necessary and appropriate to carry out the provisions of Title 11. As such order grants equitable relief, the Court must exercise its discretion as a court of equity in determining whether to enter the Channeling Injunction under the particular circumstances of this case. In exercising that discretion, the Court notes the endorsement of the Channeling Injunction by the Creditors' Committee and Lead Counsel, all of whom are fiduciaries for their respective creditor groups. The Court also notes the report of the Balloting Agent shows that each Plan Class of creditors has overwhelmingly voted in favor of the Plan, including the Channeling Injunction contained therein.

### CONFIRMATION ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED AND DECREED, on this 7th day of September, 2000, That:

137. All oral and written objections to confirmation of the Plan are overruled.

138. The Plan, a copy of which is annexed hereto as Exhibit A,[27] is hereby confirmed.

25. No decisional authority opposing the issuance of channeling injunctions was cited by any objector; these decisions were, however, referred to in the Debtors' Memorandum of Law in support of confirmation of the Plan, and have been reviewed by the Court.

26. It is also well established that non-debtor releases are authorized with the consent of the releasors, even without a fund to which released claims are channeled and even in cases that do not include the mass tort claims and other unusual circumstances present here. *See In re Continental Airlines*, 203 F.3d 203, 212 n. 11 (3rd Cir.2000) (citing cases). In this case, abundant notice was given to Class Members that the Class Representatives would accept and consent to the Plan on their behalf in the absence of an individually filed ballot. This is sufficient. *In re Mortgage &*

*Realty Trust*, 125 B.R. 575 (Bankr.C.D.Cal. 1991). *See also In re Trebol Motors Distrib. Corp.*, 211 B.R. 785, 788 (Bankr.D.P.R.1997) (class representative was the agent for class members and was authorized to file class proof of claim on their behalf without further authority); Bankruptcy Rule 3018(c) (authorized agent may cast ballot on behalf of creditor it represents). Therefore, as to all non-rejecting Class Members, on whose behalf the Class Representatives accepted the Plan, the third-party releases contained in the Plan would be valid independently of the reasoning of those cases which have approved non-consensual third-party releases.

27. The exhibits annexed to the Plan, *i.e.*, the Settlement Agreement and the Funding Agreement, are not annexed and are incorporated herein by reference.

139. The motion of the Debtors, pursuant to Article 5.1 of the Plan, for substantive consolidation of all the property of the estates, and all of the Debts, only for purposes of treating the claims pursuant to Article IV of the Plan, be, and the same is hereby, granted. Following entry of this Order, Claims against the Debtors shall be treated as follows:

all Claims held by a Debtor against another Debtor, if any, will be eliminated;

all property of the Debtors' estates will be treated as the property of a single estate, and all Claims against the Debtors will be treated as Claims against a single debtor;

all cross guaranties of the Debtors will be eliminated except for guaranties held by members of Plan Class 2;

all Claims against any Debtor for which one or more other Debtors is also liable, whether such liability is joint, several or joint and several and whether it is primary or secondary, will be merged into a single Claim against the consolidated Debtors; and

each and every Claim filed in one of the Chapter 11 Cases shall be deemed filed against the consolidated Debtors.

140. The Funding Agreement, as amended, and all of its terms and provisions, including the releases set forth in sections 4.1 and 4.2 of the Funding Agreement, as amended, be, and the same are hereby, approved.

141. The Plan satisfies any applicable requirements of the Settlement Agreement, and no Class Member has a Claim against the Debtors that will not be channeled to and treated under the Claims Resolution Facility, which shall be the sole source of payment of all Plan Class 6 Claims.

142. The Plan and this Order are integrated with each other and are nonseverable and mutually dependent.

143. The Debtors be, and they hereby are, authorized and directed to execute, deliver, file or record all documents and to take all actions necessary or appropriate to implement, effectuate and consummate the Plan, without further application to or order of this Court.

144. The Debtors be, and they hereby are, authorized and directed to enter into agreements, and to do and perform all acts, to make, execute and deliver all instruments and documents and to pay all fees and other amounts, which may be required to implement and effectuate the Plan.

145. The Plan and its provisions shall be binding upon the Debtors, the Reorganized Debtors, any entity acquiring property under the Plan, and any holder of a Claim against or Interest in the Debtors, whether or not the Claim or the Interest of such creditor or equity security holder is impaired under the Plan and whether or not such creditor or equity security holder has voted, or is deemed to have voted, for or against the Plan.

146. Except as otherwise expressly provided in the Plan, on the Effective Date, title to all property of the Debtors' estates shall revest in the Reorganized Debtors free and clear of all Liens, Claims, encumbrances, charges and Interests arising on or before the Confirmation Date and other rights and interests of holders of Claims and Interests. Subject to the provisions of the Plan and the Settlement Agreement, the Reorganized Debtors may continue in existence free of any restriction imposed by the Bankruptcy Code or the Court.

147. Except as otherwise provided in the Plan, the occurrence of the Effective Date shall operate as a discharge, pursuant to and to the full extent of section 1141(d)(1) of the Bankruptcy Code, effective as of the Effective Date, of any and all Debts of and Claims against the Debtors that arose at any time prior to the Confirmation Date. On and after the Effective Date, as to every discharged Debt and Claim, the Entity that held such Debt or

Claim shall be precluded from asserting against the Reorganized Debtors or their property any other or further Debt or Claim based upon any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

148. (a) Except as otherwise provided in the Plan, on the Effective Date, the Covered Persons are released from any and all Claims or liabilities (including Claims by or liability to any Debtor), arising from actions taken by the Covered Persons in their capacities as such, and from any and all Claims, obligations, rights, causes of action and liabilities which any holder of a Claim against any Debtor may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising based in whole or in part upon any act, omission, transaction or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases or the Plan, including any claims of equitable subordination and similar assertions.

(b) Except as otherwise expressly provided in the Plan or in this Order, on the Effective Date, each holder of a Claim against the Debtors receiving, or entitled to receive, payments or distributions pursuant to the Plan on account of such Claim shall be deemed to have forever waived, released and discharged all rights, causes of action and Claims, in law or in equity, whether based on tort, fraud, contract or otherwise, which it heretofore possessed or hereafter may possess against any Covered Person arising in any manner. From and after the Effective Date, any such right, cause of action or Claim against any Covered Person shall, without the necessity for any further action by, or notice to, any holder, automatically be relinquished, conceded, extinguished, canceled and terminated as a result of the waiver, release and discharge contained in this paragraph 148, and all such holders, with respect to any such rights, causes of action and Claims, shall be permanently enjoined on

and after the Effective Date from acting or proceeding in any manner, including commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or proceeding of any kind (including any thereof in a judicial, arbitral, administrative or other forum) against any Covered Person in derogation of the release contemplated by this paragraph 148.

149. Following the Effective Date, neither the Debtors, the Reorganized Debtors, any of their respective partners, limited liability entity members (if any), officers, directors, employees or agents, the Creditors' Committee, the Class Representatives (all of the foregoing acting in such capacity) nor any professional persons employed by any of them, shall have or incur any liability or obligation to any Entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, release or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with the Plan or the Chapter 11 Cases; provided, however, that the provisions of this sentence shall have no effect on the liability of any Entity that would otherwise result from an action or omission to the extent that such action or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

150. Pursuant to sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, the following injunctions are hereby issued:

(a) **Discharge Injunction.** All Entities which have held, hold or may hold Claims that are discharged pursuant to the terms of the Plan shall be hereby permanently stayed, restrained and enjoined on and after the Effective Date from taking any of the following actions on account of such

discharged Claims, other than actions brought to enforce any rights or obligations under the Plan: (i) commencing, conducting or continuing in any manner any action or proceeding of any kind (including any thereof in a judicial, arbitral, administrative or other forum) against the Reorganized Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the Debtors or the Reorganized Debtors, or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including pre-judgment attachment), collecting or otherwise recovering, by any manner or means, any judgment, award, decree or order against any of the Reorganized Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the Debtors or the Reorganized Debtors, or any property of any such transferee or successor, (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against any of the Reorganized Debtors, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the Debtors or the Reorganized Debtors, (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any of the Reorganized Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the Debtors or the Reorganized Debtors, or (v) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan and this Order.

(b) **Injunction as to Indemnitees.** All Entities shall be hereby permanently stayed, restrained and enjoined on and after the Effective Date from—

continuing in any manner, directly or indirectly, any action or proceeding in any judicial, arbitral, regulatory, administrative or other forum against,

enforcing, levying, attaching, collecting or otherwise recovering by any direct or indirect means any judgment, award, decree or other order against,

creating, perfecting or otherwise enforcing in any direct or indirect manner any Lien or other encumbrance against, or

setting off, seeking reimbursement of, contribution or indemnification from or subrogation against or otherwise recouping in any direct or indirect manner any amount against any liability owed to,

any Indemnitee if such action could have been taken before the Confirmation Date with respect to the rights or liabilities sought to be thus enforced or recovered and, if it had been so taken, might have resulted in an Indemnity Claim. Each Indemnitee shall have the right to independently seek enforcement of this paragraph 150.

151. **Channeling Injunction.** The entry of this Order will act as a full and complete discharge of all Liens, Claims, Debts and liabilities arising from, relating to, or in connection with, Individual Consumer Claims, except to the extent that the Settlement Agreement provides for payment thereof through the Consumer Fund or other relief with respect thereto. The injunction referred to and described in section 9.3 of the Plan is effective as provided in Article IX of the Plan. Upon entry of this Order, and except as otherwise expressly provided in the Plan. all Entities shall be hereby permanently stayed, restrained and enjoined from engaging in the Enjoined Conduct (as defined below) with respect to any of the Released Claims. "Enjoined Conduct" means:

(i) commencing, conducting or continuing in any manner, directly or indirectly, any action or proceeding in any judicial, arbitral, regulatory, administrative or other forum against,

(ii) enforcing, levying, attaching, collecting or otherwise recovering by any direct or indirect means any judg-

ment, award, decree or other order against,

(iii) creating, perfecting or otherwise enforcing in any direct or indirect manner any Lien or other encumbrance against,

(iv) setting off, seeking reimbursement of, contribution or indemnification from or subrogation against or otherwise recouping in any direct or indirect manner any amount against any liability owed to, or

(v) taking any action, in any manner, in any place whatsoever, which does not conform to or comply with the provisions of the Plan, the Plan Documents, the Settlement Agreement and the Confirmation Order regarding,

any of the Released Persons, either of the Funding Parties or any of their respective Affiliates (as defined in both the Bankruptcy Code and the Funding Agreement, as amended), successors and assigns, any property of any of them, or any direct or indirect transferee of any property of, or any direct or indirect successor in property to, any of them, or any property of any such transferee or successor.

The injunction contained in this paragraph 151 shall be construed as having the broadest possible scope. The Channeling Injunction Beneficiaries shall have the right to independently seek enforcement of the Channeling Injunction.

152. The provisions of this Order are non-severable and mutually dependent.

153. (a) Article 14.12 of the Plan is hereby modified to provide that (i) any claimants holding Administrative Expense Claims (other than holders of Special Administrative Expense Claims) not paid on the Confirmation Date shall submit such Claims in writing to the Debtors and the counsel set forth in subparagraph 154(c) below within thirty (30) days after the entry of this order on the docket (the "Administrative Expense Claims Bar Date") and (ii) holders of Special Administrative Expense Claims shall file their respective applications for payment of any amounts unpaid as of the Effective Date within sixty (60) days after the Effective Date.

(b) The Reorganized Debtors and any other party in interest will have thirty (30) days after each of the foregoing periods to review and object to such Claims or applications.

(c) All such applications shall be filed with the Court and served upon counsel for the Debtors, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corporation, One Riverfront Plaza, Newark, New Jersey 07102, Attn: Frank J. Vecchione, Esq., counsel for the Creditors' Committee, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, 28th Floor, New York, New York 10169–0005, Attn: William M. Silverman, Esq. and Sills, Cummis, Radin, Tischman, Epstein & Gross, One Riverfront Plaza, Newark, New Jersey 07102, Attn: Andrew H. Sherman, Esq., and counsel for TAF, Patterson, Belknap, Webb & Tyler LLP, 1133 Avenue of the Americas, New York, New York 10036–6710, Attn: David W. Dykhouse, Esq. The Debtors shall mail to all professionals retained by the Debtors and the Creditors' Committee pursuant to section 327 of the Bankruptcy Code, and to all parties who have filed with the Court and served upon counsel for the Debtors a notice of appearance in this case, a conformed copy of this Order (without Exhibit A) as notice of the requirements set forth in this decretal paragraph.

(d) The Court will thereafter schedule a hearing regarding the allowance of any such Claims or applications.

154. **Executory Contracts.**

(a) Rejection of the agreement between AFE and Macs To The Max dated May 18, 1998 is hereby approved.

(b) The assumption of the Debtors' agreements with Dick Clark, Olive Enterprises, Inc. and Ed McMahon by the respective Debtor party thereto on the Effective Date is hereby approved without

further action required on behalf of the Debtors.

(c) The assumption of all other executory contracts and unexpired leases of the Debtors, including, without limitation, any agreements between one or more Debtor and any State, is hereby approved.

(d) All proofs of claim with respect to Claims arising from the rejection of executory contracts pursuant to the Plan shall be filed with the Court and served upon counsel for the Debtors no later than 30 days after the date of this Order, or such Claims shall be forever barred. Within 5 days from the date of entry of this Order, the Debtors shall serve a copy hereof upon all other parties to such executory contracts or unexpired leases rejected pursuant to the Plan. Service in accordance with this paragraph is hereby deemed to be good and sufficient notice of the requirements set forth herein.

155. On the Effective Date, the duties of the Creditors' Committee will terminate, except with respect to any appeal of an order in the Chapter 11 Cases, fee applications, and any matters related to any proposed modification of the Plan.

156. All transactions effected by the Debtors during the period commencing on the Filing Date and ending on the Confirmation Date are hereby ratified.

### AMENDED FINAL ORDER AND JUDGMENT

This matter having come before the Court on the application of the Class Representatives and defendants American Family Enterprises ("AFE"), Magazine Associates ("MA," formerly known as and operating under the trade name "American Family Publishers"), TAF Holdings Inc. ("TAF") and AFP Associates, L.L.C. ("AFPA," and, collectively, the "Defendant Parties") for approval of the settlement set forth in the Settlement Agreement and the exhibits annexed thereto dated November 30, 1999 (the "Settlement Agreement"), and the Court having considered all papers filed and proceedings had herein and having held a hearing on whether to grant final approval to the proposed settlement on August 9, 2000, and otherwise being fully informed in the premises and good cause appearing therefor, it is **ORDERED, ADJUDGED AND DECREED** as follows:

1. This Final Order and Judgment adopts and incorporates herein the Settlement Agreement, and the terms defined therein. This Final Order and Judgment shall also constitute the Court's findings of fact and conclusions of law.

### I. *JURISDICTION*

2. The Court has jurisdiction over the subject matter of this action, and over members of the Class (as defined below) including, without limitation, jurisdiction to approve the proposed settlement, grant final class certification, and dismiss these actions on the merits and with prejudice. Without in any way affecting the finality of this Final Order and Judgment, this Court hereby retains exclusive and continuing jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order and Judgment, and for any other necessary purpose, including the enforcement and application of the injunctive relief set forth in the Settlement Agreement. This Final Order and Judgment expressly contemplates that all actions alleging breach of, and/or to enforce, the Settlement Agreement shall be brought before this Court as described below.

### II. *CLASS CERTIFICATION*

3. The legitimacy of a settlement class was recently confirmed by the Supreme Court in *Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

4. The Class this Court previously certified preliminarily is hereby finally certified for settlement purposes under Rules

23(b)(2) of the Federal Rules of Civil Procedure, with respect to the claims asserted against the Defendant Parties in the Master Consumer Class Action Complaint ("Master Complaint") filed in the lead action, *Jackson, et al. v. American Family Enterprises, et al.,* No. 98 CV 3850(NHP). The Subclass this Court previously certified preliminarily is hereby finally certified for settlement purposes under Rules 23(b)(2) and (b)(1)(B) of the Federal Rules of Civil Procedure, with respect to the claims asserted against the Defendant Parties in the Master Complaint. The Court finds that certification of the Class and Subclass is appropriate under all of the applicable requirements of Rule 23 of the Federal Rules of Civil Procedure. The "Class" certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure consists of and is hereby defined as all persons ("Class Members") residing in the United States, its Territories and the Commonwealth of Puerto Rico who, during the period of January 20, 1992 through and including December 9, 1999 (the "Class Period"), received any direct mail marketing materials containing sweepstakes entry materials sent under the name "American Family Publishers" that offered an opportunity to purchase magazine subscriptions or merchandise ("AFP Solicitation Materials"). The "Subclass" certified pursuant to Rules 23(b)(2) and (b)(1)(B) of the Federal Rules of Civil Procedure consists of and is hereby defined as all Class Members who, during the period of January 20, 1992 through and including December 9, 1999, ordered and made any payment for magazine subscriptions or merchandise in response to any AFP Solicitation Materials ("Subclass Members").

5. The requirements of Rule 23(a) of the Federal Rules of Civil Procedure are satisfied as follows:

a. *Numerosity:*

i. The Class and Subclass each numbers in the millions of persons.

ii. The memberships of the Class and Subclass are each ascertainable on the basis of objective criteria, and they are each so numerous that it is impracticable to bring all of them before the Court within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

b. *Commonality:* There is a well-defined commonality of interest among Class Members and Subclass Members, respectively, in that certain pervasive questions of law and fact are common to them. Class Representatives allege that Defendant Parties engaged in a common course of conduct to defraud all Class Members and Subclass Members through the use of substantially uniform omissions and misrepresentations in the form of the standardized AFP Solicitation Materials that were mailed to millions of Class Members. Class Representatives further allege that Defendant Parties' business practices, including their conduct, promotion and administration of the AFE-related sweepstakes, including their refund and billing practices, all of which were applied consistently to Class Members, violated federal and state racketeering laws and state unfair trade practices and consumer fraud acts. There are common questions of law and fact arising out of these allegations, including those set forth in the Master Complaint.

c. *Typicality:* The allegations concerning the Class Representatives arise from the same course of conduct that gives rise to the claims of the Class Members, and are based on the same legal theories, and the allegations concerning persons named as proposed representatives of the Subclass in the Master Complaint (the "Subclass Representatives") arise from the same course of conduct that gives rise to the claims of the Subclass Members, and are based on the same legal theories.

d. *Adequacy Of Representation:* As the Supreme Court recently stated in *Amchem,* 117 S.Ct. at 2236, the adequacy "inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent." There are

no conflicts or antagonisms between or among the Class Representatives and the Class Members and Subclass Members or between or among the Subclass Representatives and the Class Members or Subclass Members, because all allegedly have been subject to Defendant Parties' common course of conduct and will receive relief consistent with their arguable injuries. Class Representatives further satisfy another element in this inquiry in that they have retained counsel that are well-qualified to prosecute this litigation effectively and efficiently on behalf of the Class Members and Subclass Members.

6. The requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure are satisfied, without regard to any "limited fund" considerations (*i.e.*, without regard to the requirements of Rule 23(b)(1)(B)), because Defendant Parties allegedly acted or refused to act on grounds generally applicable to the Class with respect to the Defendant Parties' business practices, including the conduct, promotion and administration of the AFE-related sweepstakes and related billing, refund and other practices, which were applied consistently to all Class Members. Accordingly, it is appropriate that final injunctive and corresponding monetary relief be given with respect to the Class as a whole, and the Settlement Agreement provides a comprehensive "package" of injunctive relief that provides detailed and explicit reforms aimed at addressing the alleged improprieties of the sweepstakes promotions, clarifying the rules, and avoiding the allegedly misleading aspects of the promotions. These are consistent with, and were developed in conjunction with, the reform measures that are the predominant feature of the settlements between Defendant Parties and the State Attorneys General.

7. At the Final Approval Hearing, at least three class members (Ms. Maitland, Ms. Giura and Mr. Ellis, on behalf of his mother) spoke regarding the importance of prospective injunctive relief. Each of these class members emphasized their concerns, not about monetary compensation, but about modifying the practices at issue in this litigation. The Court finds that the statements of these class members demonstrates the value and importance of the *injunctive relief portions of the settlement* to the class, and confirms the propriety of certification under Rule 23(b)(2). This conclusion is further buttressed by the statements of two Class Members, Mr. Salter and Ms. Saldanha, at the hearing. Both expressed the sincere belief that they had actually won the sweepstakes grand prizes offered by AFE, relying on uniform mass mailings they received from AFE which were no different from the uniform mass mailings received by all Class Members. The confusion exhibited by Mr. Salter and Ms. Saldahna reinforces the Court's conclusion that the injunctive relief component is an integral aspect of the settlement.

8. The requirements of Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure are satisfied with respect to the Subclass for the following reasons:

a. *Claims Are Readily Ascertainable.* The value of the claims of Subclass Members have been ascertained through the claims process conducted under the terms of the Settlement Agreement, which called for Subclass Members to set forth the percentage of purchases they made from AFE in the belief that such purchases were necessary to win a sweepstakes prize or enhanced the chances of winning. A total of 61,025 timely, eligible, non-deficient claims were filed in connection with the claims process, representing refund claims in the amount of $35,211,125. An additional 1,516 otherwise eligible, late claims were received, which accounted for an additional $608,166 in refund claims. Accordingly, the total amount of such claims that Subclass Members have submitted has been ascertained and amounts to $35,819,291, plus the amount of any additional, otherwise eligible claims filed on or before August 9, 2000.

b. *Defendant Parties' Insufficient Assets.* In light of the financial information, declarations and analyses submitted for the Court's consideration, including the information submitted in connection with the Chapter 11 bankruptcy filing of Defendant Parties AFE and MA, the Court finds that the costs and risks of individual adjudications greatly exceeds the Defendant Parties' limited resources, which would soon be exhausted if individual litigation were allowed to continue, and that the assets at the disposal of the Defendant Parties constitute a "limited fund" against which claims are properly subject to class certification under Rule 23(b)(1)(B). The evidence shows that:

i. Defendant Parties AFE and MA have no value as going concerns in the absence of approval of the settlement and confirmation of the Plan. As of October 31, 1999, AFE and the other debtors collectively had a negative net worth of $13 million and had, for the previous twelve months incurred a net loss of $76 million. As of June 30, 2000, their net worth had declined to negative $36.4 million (excluding accrued liabilities for costs of the settlement). Under a liquidation analysis, no funds would be available to unsecured creditors, including Class Members;

ii. Defendant Party TAF has no significant assets other than its ownership interests in the Debtors, with such assets being less than one thousand dollars in cash; and

iii. Defendant Party AFPA has minimal assets other than its ownership interests in the Debtors, with such assets consisting of an illiquid minority interest in an office building valued as less than one million dollars.

c. *Contribution Of Assets To Settlement.* The Defendant Parties are contributing, or having contributed on their behalf, an amount greater than their individual and collective net worth to fund this settlement. These contributions are conditioned upon approval of the settlement, and the record establishes that the Defendant Parties would be unable to raise such additional funds in the absence of approval of the settlement.

d. *Equitable Treatment Of Subclass Members.* The settlement provides equitable treatment of Subclass Members by providing *pro rata* refunds of all eligible + claims made by those who spent money on magazine subscriptions and merchandise under the belief that the purchases were necessary to win a sweepstakes prize or enhanced the chances of winning. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 2312, 144 L.Ed.2d 715 (1999) (in a limited fund settlement, the fund should be "distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, *pro rata* distribution").

In light of these facts, the prosecution of separate claims against the Defendant Parties by individual Subclass Members would create the risk of individual adjudications, which would, as a practical matter, be dispositive of the interests of other Subclass Members, or which would substantially impair the ability of other Subclass Members to protect their interests.

■ 9. One Class Member objects that designating this action as a mandatory class is unconstitutional. A number of other Class Members have requested exclusion from the Class. However, where the requirements for certification of a class under Rules 23(b)(1)(B) or 23(b)(2) have been satisfied, there is no constitutional or other right to opt-out of the class. *See In re Orthopedic Bone Screw Prod. Liability Litig.,* 176 F.R.D. 158, 180 (E.D.Pa.1997) (rejecting objections to certification of limited fund settlement class, agreeing that "certification of a mandatory class under Rule 23(b)(1)(B) does not violate due process"); *Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295, 1299 (9th Cir. 1981) ("Nor does due process require the unnamed plaintiffs be given a chance to opt out of Rule 23(b)(2) class actions. Due process requires only that class members

be adequately represented."); *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393 (3d Cir.1981) ("if the case falls within Rule 23(b)(2), class members are not entitled to notice of the pendency of the action and may not opt out"); *Laskey v. Intern. Union, United Auto. Aerospace and Agricultural Implement Workers*, 638 F.2d 954, 957 (6th Cir.1981) ("Rule 23(b)(2), Fed. R.Civ.Pro., ... does not have a right to opt out .... Thus, the failure to notify the class members of the right to opt out of the class is not a violation of due process."); *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir.1977) ("When appropriate notice and opportunity [to be heard] have been provided, preclusion of the opt-out right in a(b)(1) settlement does not violate due process."); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 252–53 (3d Cir.1975) ("the procedural protections of (b)(3), opting out and notice, are ... unnecessary for the homogeneous (b)(2) class"). Accordingly, the mandatory Class and Subclass suffer no constitutional infirmities, and the opt-out requests are invalid.

■■■ 10. One Class Member, who is also a named plaintiff in one of the actions transferred to this Court as part of the MDL Litigation, objects to the inclusion of absent class members in the Class. By definition, class actions include within the class persons who are not plaintiffs in any pending action, who often have little stake in the outcome, and who take no active role in the litigation. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812–13, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (class membership may not be limited to those who affirmatively request inclusion, noting that "[t]he plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required").

11. Accordingly, the Court hereby certifies the Class and Subclass, as described above, and the objections to class certification are overruled.

## III. NOTICE

■■■ 12. The Court finds in its discretion that the Notice Plan, as set forth in the Settlement Agreement, and implemented by the parties, was reasonably calculated under the circumstances to apprise Class Members of the MDL Litigation and the proposed settlement, their right to object to the proposed settlement and to appear at the Final Approval Hearing, the binding effect of the orders and judgment in this action, whether favorable or unfavorable, on all Class Members, and satisfied all of the requirements for a combined notice of class certification and a proposed settlement as set forth in the *Manual for Complex Litigation, Third*, §§ 30.211, 30.212 (Federal Judicial Center, 1995). The affidavits submitted by the parties' notice experts, Katherine Kinsella and Wayne L. Pines, estimate, respectively, that the Notice Plan reached at least 90 to 93% of Class Members an average of 2.8 to 3.1 times. There have been no objections to the form or content of the Publication Notice or the Notice Packet, or the sufficiency of the Notice Plan, by any Class Members. The Notice Plan satisfied due process, constituted adequate and sufficient notice to all persons entitled to be provided with notice, generated approximately 143,000 claims, and fully complied with the requirements of Rule 23 of the Federal Rules of Civil Procedure and Rule 2002 of the Federal Rules of Bankruptcy Procedure.

## IV. FAIRNESS, ADEQUACY, AND REASONABLENESS OF THE SETTLEMENT

■■■ 13. Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983). The Third Circuit has identified nine fac-

tors that a district court should consider when making this determination:

"(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation...."

*In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 317 (3d Cir.1998), quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975).

These factors

are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh.*

*Bone Screw*, 176 F.R.D. at 184 (citation omitted).

### A. *The Complexity, Expense, and Duration of the Litigation.*

14. Many of these cases have been pending for over two and one-half years. They have, collectively, already consumed millions of dollars in attorney time and litigation expenses on both sides. While significant discovery has been conducted, additional work remains to be done to fully prepare the cases for trial. *See In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir.1986) ("Although much discovery has been conducted, much would remain if the parties were to go to trial."). At trial, Plaintiffs would likely need to introduce expert testimony to establish liability and damages. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F.Supp. 450, 539 (D.N.J.1997) ("another potential risk may be plaintiffs' necessary reliance on expert testimony to establish liability and damages; a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And, divergent expert testimony leads inevitably to a battle of the experts."). Given the large sums of money at issue, the losing party is almost certain to appeal. *See In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 2000 WL 567104 (E.D.Pa.2000) ("the extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed. This factor thus weighs in favor of the proposed settlement."). The bankruptcy of the principal Defendant, AFE, may further complicate and delay a final resolution of this matter through litigation. Accordingly, the complexity, expense, and duration of the litigation weigh heavily in favor of approval of the proposed settlement. *See, e.g., Prudential*, 148 F.3d at 318 ("The court found that litigation would require expensive and time consuming discovery, would necessitate the use of several expert witnesses, and would not be completed for years. Consequently, the court concluded that this factor weighed in favor of settlement. We agree.").

### B. *The Reaction of the Class and Subclass to the Proposed Settlement.*

15. On balance, the response of the Class and Subclass to the proposed settlement has been very favorable. The Class and Subclass each have tens of millions of members, placing them among the largest of which the Court is aware. Over 143,000 persons filed claims with the Settlement Administrator, seeking a share of the proposed settlement. Fewer than 150 Class Members have objected in any way to the proposed settlement, with the plurality of

these claiming entitlement to sweepstakes grand prizes based on their receipt of and response to the standardized sweepstakes mailings. *See Prudential,* 148 F.3d at 318 (district court properly discounted objections filed by handful of litigants in cases with competing or overlapping claims). This represents an infinitesimal fraction of both the Class and Subclass. While courts are more cautious today about inferring support from a small number of objectors to a sophisticated settlement, the principal economic terms of this settlement are relatively straightforward (*i.e.,* partial refunds and special sweepstakes), and the small number of objections weighs in favor of approval. *Id.; Bone Screw,* 176 F.R.D. at 185 ("It would certainly be preferable if there were no objections but that would be contrary to a mature and realistic expectation in a settlement such as this one.... [T]he relatively low objection rate 'militates strongly in favor of approval of the settlement'" (citation omitted)).

16. In addition, a number of State Attorneys General have agreed to settle their *parens patriae* claims against AFE on the basis, *inter alia,* that their residents will receive *pro rata* shares of the Refund Pool. This also militates in favor of approval of the Proposed Settlement. *See Prudential,* 962 F.Supp. at 537–38 ("The Court also finds as an extremely favorable indicator of class reaction, the fact that the insurance regulators in all fifty states and the District of Columbia have accepted the proposed settlement as fair and adequate. Thus, the regulators of all the states as representatives of their constituencies have indicated their complete approval of the proposed settlement.").

**C.** ***Stage of Proceedings and Amount of Discovery Completed.***

17. As set forth in their Memorandum, Lead Counsel had the benefit of significant formal and informal discovery before entering into the proposed settlement. Much of this information was provided informally by the Defendants to facilitate settlement discussions, with the knowledge and approval of the Court. *See Prudential,* 148 F.3d at 319 ("the court found that class counsel's 'use of informal discovery was especially appropriate in this case because ... informal discovery could provide the information that plaintiffs needed.' ... We see no error here."). The Court has observed that Lead Counsel were able to use this information effectively in their negotiations with the Defendant Parties, and finds that Lead Counsel had an adequate appreciation of the merits of their claims, both as to liability and damages, before entering into the proposed settlement. Accordingly, the stage of proceedings, and the amount of discovery completed, weigh heavily in favor of the proposed settlement.

**D.** ***The Risks of Establishing Liability and Damages.***

18. A number of Courts have adjudicated claims against American Family Publishers and other sweepstakes companies that are very similar to the claims asserted by the Class Representatives and the other plaintiffs in the MDL Litigation, both in terms of the legal theories and the underlying facts. With one exception, these claims have been dismissed on the pleadings or the plaintiffs have suffered summary judgment, and several of these decisions have been affirmed by the Fourth, Sixth, and Ninth Circuits. *See, e.g. Workmon v. Publishers Clearing House,* 118 F.3d 457 (6th Cir.1997) (affirming district court's denial of motion to amend to add statutory consumer fraud claim as futile, finding that in light of conditional language, plaintiff's belief that he had won the sweepstakes was not reasonable; affirming grant of summary judgment on breach of contract claim based on presence of conditional language); *Freeman v. Time, Inc.,* 68 F.3d 285 (9th Cir. 1995) (affirming dismissal of statutory consumer fraud and common law fraud claims, finding that in light of qualifying language, and taken in context, a reasonable person

would not be deceived by sweepstakes mailing, and it was doubtful plaintiff suffered any damages; plaintiff did not challenge district court's dismissal of breach of contract claim); *Sharpe v. American Family Publishers*, 25 F.3d 1040, 1994 WL 224180 (4th Cir.1994) (unpublished disposition) (affirming grant of summary judgment on statutory consumer fraud and common law fraud claims, finding that plaintiff could not establish either reasonable reliance on or damages proximately caused by representations). However, in *Miller v. American Family Publishers*, 284 N.J.Super. 67, 663 A.2d 643 (1995), the trial Court found that plaintiffs' claims under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1, *et seq.*, and for common law fraud presented triable issues of fact. The Court does not have motions to dismiss or motions for summary judgment before it, and does not now resolve the disputed questions of fact and law that such motions may present. The Court finds only that in light of the conflicting decisions of other Courts that *have* decided similar questions, Plaintiffs face substantial risks in establishing both liability and damages. Accordingly, these risks weigh heavily in favor of the proposed settlement.

### E. The Risks of Maintaining the Class Action Through Trial.

19. The Defendant Parties have stipulated to the certification of the Class and Subclass for settlement purposes, and have reserved all of their defenses to class certification if the proposed settlement is not approved. Accordingly, under *Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Court need not and does not decide at this time whether the Class and Subclass would remain certifiable through trial if the proposed settlement is not approved. As the primary relief sought by the Class is injunctive, the Class may remain certifiable through trial under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Unless the Defendant Parties' financial condition

improves dramatically, the Subclass may also remain certifiable through trial under Rules 23(b)(1)(A) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. However, the bankruptcy of AFE and MA, and the decision they may face whether or not to continue in business if this settlement were to fail, may have a substantial impact on one or both of these issues. The Third Circuit has recently observed that this sixth *Girsh* factor has become "toothless" and insignificant. *Prudential*, 148 F.3d at 321. Accordingly, its application to the proposed settlement is also insignificant.

### F. Ability to Withstand a Greater Judgment.

20. In a limited fund settlement, "[i]t is inherent … that [the defendant] would not be able to withstand a greater aggregation of judgments than the proposed settlement amount …." *Bone Screw*, 176 F.R.D. at 186. *See also In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir.1995) ("a settlement may represent the best method of distributing damage awards to injured plaintiffs, especially where litigation would delay and consume the available resources and where piecemeal settlement could result, in the Rule 23(b)(1)(B) limited fund context, in a suboptimal distribution of the damage awards"). As set forth above, the Defendant Parties cannot withstand any significant judgment at all, let alone a greater judgment than the $33 million in monetary relief being offered in compromise. Accordingly, this factor weighs most heavily in favor of the proposed settlement.

### G. Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.

21. The Claims Administrator reports that the Subclass Members who have submitted eligible claims will receive an average of $511, representing approximately

90% of their Maximum Refunds.[1] This is an excellent result for any contested litigation, let alone a case in which the principal Defendants are in bankruptcy without any net worth or liquidation value, and in which, while Class Members' hopes for sweepstakes prizes may have been dashed, they unquestionably received the consumer magazines and merchandise they ordered, generally at discount prices. In light of the risks the Class Representatives face in establishing liability and damages at trial, prevailing on appeal, the attendant delays in payment, and the Defendant Parties' inability to satisfy a greater judgment, the Court finds that the proposed settlement is fair, adequate, and reasonable, under the nine *Girsh* factors. *See Prudential*, 962 F.Supp. at 451 ("The Court finds also that the proposed settlement is fair, reasonable, and adequate in light of the best possible recovery and the attendant risks of litigation. To estimate the best possible recovery for plaintiffs in the aggregate would be exceedingly speculative, and unnecessary here. In the present case, an individual's recovery exceeds the value of the best possible recovery discounted by the risks of litigation."); 148 F.3d at 322 (affirming district courts analysis, noting that class members "will receive full compensation without paying attorneys fees and without delay").

### H. *Opinion of Experienced Counsel.*

█ 22. In determining the fairness, adequacy, and reasonableness of a proposed settlement, significant weight should also be given "to the belief of experienced counsel that settlement is in the best interest of the class," so long as the Court is satisfied that the settlement is the product of "good faith, arms-length negotiations." *Bone Screw*, 176 F.R.D. at 184 (internal quotations and citations omitted). The

Court has had ample opportunity to observe the conduct of Lead Counsel in their negotiations with the Defendants, and finds that Lead Counsel have extensive experience in complex class action litigation; that the proposed settlement is the product of extensive, good faith, arms-length negotiations; and that significant weight should therefore be given to the belief of Lead Counsel that the proposed settlement is in the best interests of the Class and Subclass.

### V. *OBJECTIONS TO THE PROPOSED SETTLEMENT.*

23. The Court has received communications from approximately 175 Class Members, most of them unrepresented by counsel, concerning the proposed settlement. Approximately ten Class Members, their counsel, and/or relatives appeared at the Final Approval Hearing. Of these, nine spoke regarding the settlement. Several of these presentations were not, strictly speaking, objections, and in fact Class Members Cecilia Maitland and Sandra Giura spoke generally in favor of the settlement. One Class Member present used the occasion to fill out and submit a claim form to ensure her receipt of benefits under the settlement.

24. The Court has reviewed and considered each of the many written communications it has received from Class Members, and they will be addressed in the categories into which they fall.

### A. *Objections from Class Members Seeking Sweepstakes Prizes.*

25. The most common objection to the proposed settlement is from Class Members who believe that they have won one or more significant sweepstakes prizes from AFE based on their receipt of and response to AFE's form letter sweep-

---

1. The Claims Administrator reported that eligible claimants would receive either $524 ($32 million/61,025) or $511 ($32 million/(61,025 + 1,516)), depending on whether or not the Court authorized the payment of otherwise eligible, late-filed claims. In light of the minimal impact the allowance of late-filed claims will have on the average recovery, the Court orders that the Claims Administrator honor all otherwise eligible, late-filed claims received by the date of the Final Approval Hearing, August 9, 2000.

stakes mailings. Many of these Class Members have supplied the Court with the sweepstakes mailings they received from AFE on which they base their claims. These Class Members are unhappy with the proposed settlement because it will not require AFE to pay them these prizes, and will release AFE from any obligation to do so.[2]

26. The Court has reviewed the sweepstakes mailings provided by these Class Members, and finds that they contain the identical conditional, qualifying language, such as "If you have the winning number, please be advised ....", that is featured in the mailings sent to the Class as a whole.

AFE has submitted an uncontroverted affidavit that all of its mailings during the Class Period contained similar qualifying language, Lead Counsel have extensively examined these standard mailings and compared them to the exemplars that the objectors are submitting to support their claims to unique treatment, and the fact of uniformity is apparently not in dispute. The Court has also received an affidavit from a representative of AFE attaching lists of the winners of all of the sweepstakes prizes over $250 it has awarded during the Class Period, and confirming that none of these objectors appear on any of these lists.

---

2. One Class Member, G.A. Ridpath, did not file any objection to the proposed settlement until August 1, 2000, and then filed a 21–page objection to the proposed settlement on this basis. On February 4, 2000, Mr. Ridpath was mailed a copy of the Notice Packet, informing him that all objections to the proposed settlement must be filed with the Court by May 5, 2000. Counsel for Mr. Ridpath has offered no explanation for this tardy filing. While the Court is not entirely inflexible with respect to this deadline, Mr. Ridpath's objection, filed nearly six months after he received notice of the deadline, nearly three months after expiration of the deadline, and on the eve of the Final Approval Hearing, is stricken as untimely. Another Class Member, Evelyn Sanborn, who also seeks the award of sweepstakes prizes, did not file any objection to the proposed settlement until August 7, 2000, substantially repeating arguments made in support of her motion to intervene filed on June 14 2000. Like Mr. Ridpath, Ms. Sanborn was mailed notice of the May 5, 2000 deadline for filing objections to the proposed settlement and plan of reorganization on February 4, 2000. Accordingly, her objections are also stricken as untimely. Several objections were also put forward in a memorandum filed by counsel for Class Members Arlene Andresen, Signe Sevigny, and James Broccolo on August 8, 2000—the day before the Final Approval Hearing. This eleventh-hour filing is likewise stricken as untimely.

In any event, Mr. Ridpath's counsel effectively withdrew his objections at the Final Approval Hearing, stating that he did "not want to set this [settlement] aside," but only wished to encourage the Court to "take a critical look" at his argument that some of the settlement funds should be set aside for his client and the other individual plaintiffs who have asserted breach of contract claims against AFE and other Defendants. For the reasons set forth herein, the Court has considered Mr. Ridpath's arguments, and finds them wanting. The Court has examined the AFP Solicitation Materials appended to Mr. Ridpath's *Response to Debtor's Objection to and Motion to Reclassify and Conditionally Expunge Alledged [sic] Improperly Filed Individual Consumer Claims*, and finds that they are similar or identical to the AFP Solicitation Materials attached to the Master Complaint, and contain similar or identical language conditioning or qualifying any representations that the recipient has won a sweepstakes prize (*e.g.*, "If you have and return the winning number, we'll say ..."). Mr. Ridpath also argues that the Class Representatives are inadequate to represent his interests, because they did not previously assert breach of contract claims. On the contrary, Class Representatives Ina Brown and Priscilla Young asserted breach of contract claims on behalf of nationwide classes in their original complaints filed in January 1998 and March 1998, respectively. Mr. Ridpath also argues that insufficient discovery was taken regarding the merits of the breach of contract claims. This is an odd objection, in light of Mr. Ridpath's argument in his *Memorandum in Support of Judgment on the Pleadings and in the Alternative for Summary Judgment* that the AFP Solicitation Materials appended to his complaint are self-explanatory, and that "there can be and need be no testimony or evidence attempting to explain that the wording means something different from its plain meaning." Lead Counsel report that they were provided with, and reviewed, a complete collection of the AFP Solicitation Materials disseminated during the Class Period. By Mr. Ridpath's own reasoning, no additional relevant discovery is necessary or even possible on the breach of contract claims.

27. The chief objection of the Class Members who appeared to object at the Final Approval Hearing likewise centered around their belief that the mailings they had received from the defendants uniquely entitled them to claim a sweepstakes prize. They did not have any appreciation that the mailings they received, although they were personalized by computer, are in fact duplicates of mailings sent to millions of other class members. Indeed, the specific representations and suggestions in these mailings constitute the basis of the common claims of the *entire* class, not unique claims of any Class Members. And while that was difficult for these Class Members to comprehend, appreciate, and accept, the Court has reviewed the mailings provided by these objecting Class Members, compared them to AFE's standardized mailings that have been provided by the parties, and has concluded that in fact the operative language is identical and does not give rise to any unique claims on the part of *individual* Class Members.

28. "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). However, AFE and other sweepstakes companies have been subject to similar claims for sweepstakes prizes in other cases. In each of these other cases, these claims have been dismissed on the pleadings, or the plaintiff has suffered summary judgment. *See, e.g., Fazio v. Time, Inc.*, 142 F.3d 443, 1998 WL 225062 (9th Cir. Apr.24, 1998) (unpublished disposition) (affirming dismissal of breach of contract claim), *Workmon v. Publishers Clearing House*, 118 F.3d 457 (6th Cir.1997) (affirming grant of summary judgment on breach of contract claim based on presence of conditional language); *Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir.1995) (affirming

dismissal of statutory consumer fraud claims based on presence of conditional language; plaintiff did not challenge district court's dismissal of breach of contract claim); *Billet v. American Family Publishers*, 822 F.2d 61, No. 86–2387, slip op. (unpublished disposition) (9th Cir.1987) (affirming dismissal of breach of contract claim); *Fozard v. Publishers Clearing House*, 1:98cv00149, slip op. (E.D.N.C. Apr. 29, 1999) (dismissing breach of contract claim based on presence of conditional language); *Mobley v. Fred C. Shotwell of American Family Publishers Million Dollar Sweepstakes*, No. C–3–90–422, slip op. (S.D.Ohio July 12, 1991) (granting AFP's motion for summary judgment on breach of contract claim); *Silvious v. American Family Publishers*, No. CA–90–40–C–K (N.D.W.Va. July 30, 1990), *aff'd*, 922 F.2d 836, 1991 WL 1823 (4th Cir.1991) (granting AFP's motion for summary judgment on breach of contract claim); *Alvarado v. The Reader's Digest Ass'n, Inc.*, No. 89CV1776, 1989 WL 200951 (D.N.J., Oct 10, 1989) (Wolin, J.) (granting summary judgment on breach of contract claim).

29. The Court concludes that Class Members' claims that they are entitled to prize money by virtue of their receipt of and response to AFE's sweepstakes mailings do not have a sufficient probability of success to be assigned any value in weighing the fairness of the proposed settlement. *Curtiss–Wright Corp. v. Helfand*, 687 F.2d 171, 174–75 (7th Cir. 1982) ("Not only is the class action procedure equitable in origin, but the allocation of an inadequate fund among competing complainants is a traditional equitable function—using 'equity' to denote not a particular type of remedy, procedure, or jurisdiction but a mode of judgment based on broad ethical principles rather than narrow rules. To make an equitable allocation in this case the judge did not have to resolve trial-type issues of liability and therefore did not have to conduct a trial. He had only to weigh the relative deservedness of Curtiss–Wright and the oth-

er class members, and he could do this on the basis of the undisputed facts before him." (citations omitted)).

30. The same sweepstakes mailings on which these objecting Class Members base their assertion of unique claims or entitlement to preferential treatment were also sent to millions of other Class Members, many of whom also responded by ordering magazines or merchandise within the time allowed. Accordingly, to the extent these claims have any value, they do not belong exclusively to the objectors, but belong to the entire Subclass, and the Subclass Representatives have asserted these claims on their behalf, both in the *Master Complaint* filed in these MDL proceedings, and in a number of other complaints filed at the inception of this litigation in early 1998. By dividing the limited settlement fund in proportion to these purchases, the proposed settlement fairly allocates the available funds among the holders of these claims as well. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 2312, 144 L.Ed.2d 715 (1999) (in a limited fund settlement, the fund should be "distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution").[3]

### B. *Objections to the Amount of the Proposed Settlement.*

31. A number of Class Members object to the amount of the proposed settlement on various grounds. Several complain that Class Members will receive little or nothing under the proposed settlement. In fact, as set forth above, Subclass Members who filed eligible claims with the Settlement Administrator will receive average refunds of over $500, representing approximately 90% of their eligible claims. This is a significant sum.

■ 32. Several Class Members object that the $33 million settlement fund constitutes only a fraction of the revenues or profits earned by AFE during the Class Period. However, AFE's revenues or profits are not the appropriate measure of damages. *See* Memorandum Opinion and Order, *Vollmer v. Publishers Clearing House*, No. 99–CV–434–GPM (S.D.Ill. Feb. 18, 2000) (*"Vollmer,"*), at 37–38.

■ 33. Several Class Members complain that AFE has convinced them that they had won or were about to win the sweepstakes, causing them varying degrees of mental anguish, for which a number of them seek additional compensation. Such claims of emotional distress are governed by an objective, "reasonable person" standard. *See* Restatement (Second) of Torts, § 46, com. j ("The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge."). All of the members of the Class and Subclass received substantially similar mailings from AFE, and it is reasonable to assume that those Class Members who became "obsessed" with the sweepstakes were among AFE's most frequent and loyal customers. Accordingly, allocating the available settlement funds in proportion to each Class Member's purchases is the fair-

---

**3.** This also answers Mr. Ridpath's objection that a subclass should be created, composed of approximately 23 persons who have filed individual actions asserting breach of contract claims. Ms. Sanborn makes a similar argument that her claim for sweepstakes prizes should be treated differently than the claims of other Class Members. It is axiomatic that all class members possessing similar claims must be treated equally, and that preferential treatment of the type suggested by Mr. Ridpath and Ms. Sanborn is impermissi-

ble. *Ortiz, supra.* It is also worth noting that at the Final Approval Hearing, Lead Counsel represented that Mr. Ridpath has filed a claim with the Claims Administrator, stating that he ordered magazines or merchandise from AFE in the mistaken belief that placing an order was necessary to win or enhanced his chances of winning a sweepstakes prize, and that Mr. Ridpath will accordingly receive a partial refund under the terms of the settlement.

est method of distributing compensation for these claims as well.

### C. Objections Based on Alleged Misconduct of AFE.

■ 34. A number of Class Members focus on the egregiousness of AFE's alleged misconduct, for which a number of Class Members object that AFE should be required to pay punitive damages. However, single damages, not treble or punitive damages, are the appropriate yardstick by which the fairness of a proposed class action settlement should be measured. *See In re Dennis Greenman Sec. Litig.*, 622 F.Supp. 1430, 1441 (S.D.Fla. 1985) ("potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station"), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir.1987); *Fisher Bros. v. Phelps Dodge Ind., Inc.*, 604 F.Supp. 446, 451 (E.D.Pa. 1985) (reasonableness of settlement should be evaluated based on single, rather than treble damages).

35. Similarly, several Class Members would like to see defendants criminally prosecuted. This is a civil matter, and the Class Representatives do not have the power to institute criminal proceedings. It is also worth noting that the Attorneys General of 45 States and the District of Columbia, who *do* have that power, and who have closely scrutinized the business practices of AFE, have also elected to pursue civil, rather than criminal remedies. One Class Member objects that the proposed settlement and/or Plan would give Defendants immunity from criminal prosecution. It does not. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1028 (9th Cir. 1998) ("The attorneys general remain free to act as they see necessary to enforce the consumer laws of their state. Chrysler and Class counsel cannot prohibit state enforcement and never argued they could.").

■ 36. Similarly, a number of Class Members object that AFE should be denied bankruptcy protection because of its alleged misconduct.[4] Issues related to the Defendant Parties' bankruptcy will be addressed in a separate order concerning their proposed plan of reorganization. However, the Court notes here that past misconduct is not a ground for denying a business relief under Chapter 11. *See In re Jake's on the Pike*, 78 B.R. 461, 462 (Bkrtcy.E.D.Va.1987) (exceptions to discharge do not apply to corporations, partnerships, or other non-individuals).

### D. Objections to the Allocation Formula.

37. Several Class Members object to the allocation formula, under which the $32 million Refund Pool will be divided among Subclass Members in proportion to their purchases during the Class Period which

---

4. At the Final Approval Hearing, counsel for Class Members Andresen, Sevigny, and Broccolo alleged for the first time that there had been inadequate disclosures concerning the Defendant Parties' financial condition and relationship with other Defendants, and suggested that the U.S. Trustee appoint a third party to investigate. Counsel for these Class Members conceded that this objection did not appear either in his timely objection filed on May 4, 2000, or in his untimely additional objections filed the day before the Final Approval Hearing (*see* n. 1, supra). Counsel for these Class Members sought to excuse this failure by complaining that he had been left "out of the loop" concerning the proposed settlement, but conceded that he had received the Settlement Agreement in December 1999, and that he timely received the Debtors' Disclosure Statement—which fully sets forth these matters, and on which he now bases this objection—and that he had made no effort to further inform himself about the terms of the settlement or the matters of which he now complains. Accordingly, this objection is stricken as untimely. In any event, the U.S. Trustee assured the Court on the record that it had sent a financial analyst to the Debtors' premises, reviewed their accounting practices and monthly operating reports, and was satisfied that there was no fraud, dishonesty, incompetence, or mismanagement which would justify appointment of a trustee under section 1104 of the Bankruptcy Code.

exceed the greater of $40 per year or the percentage of their total purchases influenced by the belief that a purchase was either necessary to win or enhanced their chances of winning a sweepstakes prize, as reported on their Claim Forms.

38. AFE contends that Class Members have not suffered any damages, because they received the magazines they paid for. *See Miller,* 284 N.J.Super. at 87–88, 90–91, 663 A.2d at 654–55 ("Plaintiffs here claim that [they] suffered 'ascertainable loss' because they relied on defendant's misleading sales material when they purchased magazine subscriptions. They say they paid money because they were told, and believed, that for their money they would receive two things: first, a magazine subscription; and second, the ability to remain a part of defendant's sweepstakes ... and an enhanced likelihood of winning the sweepstakes. They acknowledge that they received the first. They say that they did not receive the second."). The Class Representatives contend that many Class Members were induced by AFE's sweepstakes mailing to make excessive purchases. According to official U.S. Census figures, of which the Court takes judicial notice, adults in the United States spent an average of approximately $40 per year during the Class Period on consumer magazines, which are what AFE sells. Accordingly, the Court finds that the allocation formula is fair, adequate, and reasonable, because it takes into account a reasonable value received by Class Members for their purchases (based on an objective reference point), which is one of AFE's principal defenses. *See also Vollmer,* at 38–39 (fact "that only a fraction of Defendants' customer base purchased more than the national average in magazines during the Class Period" indicates that "only a fraction of PCH's customers made purchases for the 'wrong' reasons").

39. One Class Member complains that the $40 threshold discriminates against low income individuals. There is no evidence in the record that lower income Class Members will be disproportionately affected by the $40 threshold. For example, the Class Representatives have provided the Court with information indicating that a number of elected officials apparently believe that the poor account for a disproportionate number of ticket sales in state-run lotteries. *See* G. Lucas, *Lottery Says People of All Incomes Play, But Legislators Suspect Disproportionate Buying by Poor Residents,* San Francisco Chronicle, Dec. 15, 1999, at A9, 1999 WL 2702969. If this perceived phenomenon extends to sweepstakes purchases, then lower income individuals made more purchases, have higher claims, and will receive larger refunds under the settlement. Even assuming, *arguendo,* that the $40 threshold has a disparate impact on lower income Class Members, it would not constitute a denial of equal protection, as the threshold has a rational basis, as set forth above. *See Black v. Sec. of Health & Human Services,* 93 F.3d 781, 787–89 (Fed.Cir.1996) (threshold of $1,000 in unreimbursable expenses for benefits under National Childhood Vaccine Injury Act did not deny indigent persons equal protection despite disparate impact, because there was a rational basis for the eligibility test, and "[w]hile the statute contains an express expense requirement, it does not classify petitioners based on their ability to pay").

40. One Class Member objects that there will be no distributions to Class Members of less than $5. This is a *de miminis* amount. *See* Fed. R. Bankr.P. 3010 ("In a chapter 7 case no dividend in an amount less than $5 shall be distributed by the trustee to any creditor unless authorized by local rule or order of the court."). The parties have also submitted evidence that it is the usual custom and practice in class action settlements to have a similar threshold below which checks will not be issued, because the administrative cost of doing so exceeds the benefit.

**E.** *Objections to the Scope of Injunctive Relief.*

41. Two Class Members object to the scope of the injunctive relief contained in the proposed settlement. One Class Member objects that AFE needs to be clear that its contests span a number of years,[5] and that the chances of winning are infinitesimal. The proposed settlement addresses both of these concerns, by: (1) requiring that AFE award its grand prizes annually, rather than bi-annually, for a period of three years; and (2) requiring that the Official Rules contained in all AFE solicitations include (a) the sweepstakes end dates, and (b) the estimated odds of winning each prize.

42. One Class Member requests that the Official Rules contain a prominent statement that all entries must be returned by U.S. Mail, and wants all promotional materials dated so that Class Members can determine the date their entries must be postmarked. The proposed settlement addresses these concerns, by requiring that AFE solicitation materials provide a clear description of the entry process, and clear directions for determining the date that entries must be postmarked.

**F.** *Objections to the Special Sweepstakes.*

43. Several Class Members object to the special sweepstakes component of the proposed settlement, under which ten Class Members selected at random will each receive cash prizes of $100,000. These objectors question the purpose of the special sweepstakes; argue that it is a "lure," "bait," "bribe," or "gimmick" to attract claimants; is inconsistent with the basis of the case; and/or are suspicious that the prizes will not be awarded randomly.

44. Many Subclass Members have stated on their Claim Forms that they ordered magazines and/or merchandise from AFE in the mistaken belief that such purchases were either necessary to win or enhanced their chances of winning a sweepstakes prize. The purpose of the special sweepstakes is to give such Subclass Members the "benefit of the bargain" they *thought* they had made, by awarding a number of special sweepstakes prizes, with the winners selected at random from among the members of the Subclass. *See Miller* 284 N.J.Super. at 88, 663 A.2d at 654 (plaintiffs "say they paid money because they were told, and believed, that for their money they would receive two things: first, a magazine subscription; and second ... an enhanced likelihood of winning that sweepstakes.... They say they did not receive the second."). As the Court explained in rejecting objections to a similar component of the Publishers Clearing House settlement:

The Automatic Sweepstakes Entries relief, also known as the "benefit of the bargain" relief, ... also confers a benefit on the Settlement Class. The relief provides a specific remedy for a specific claim that is central to this litigation, namely, that people bought items from PCH because they thought that purchasing the items would give them a better chance to win the Sweepstakes. By giving each member of the Subclass additional entries over and above any entries he or she may already have in future Sweepstakes, members of the Subclass are getting what they thought they were getting by making purchases.

Offering additional entries to PCH's sweepstakes does not promote PCH. Entries are automatic and do not require Class Members to conduct any business with PCH or indeed take any action at all.

*Vollmer,* at 49–50.

45. Neither is there any basis for objectors' suspicions that the drawing may

---

**5.** At the Final Approval Hearing, Ms. Sanborn similarly objected that AFE did not award a sweepstakes grand prize in 1998.

not be random. The Settlement Agreement expressly provides that the winners will be selected in a random drawing conducted by an independent judging company, and that the Class Representatives may have an independent monitor review the conduct of the special sweepstakes.

### G. *Objection to the Release of the Non–Settling Defendants.*

46. Several Class Members object that the proposed settlement would release parties other than the Defendant Parties, AFE, MA, TAF, and AFPA. AFE and MA are insolvent, and TAF and AFPA have no significant assets other than their interests in the insolvent entities. The proposed settlement is being funded entirely by defendant Time, Inc. and AFP Partners, LLC (an entity affiliated with AFPA), acting on behalf of themselves, their affiliated entities, and defendants McMahon and Clark, who are the beneficiaries of longstanding indemnification agreements with AFE.[6]

47. The amounts being contributed by and on behalf of these additional released parties are sufficient to reimburse Subclass Members for approximately 90% of their ascertainable losses, which is a fair and reasonable compromise irrespective of the "limited fund" nature of the proposed settlement. Courts have consistently held that so long as the total compensation paid to the plaintiff class is fair, it does not matter that even *noncontributing* parties are released by a settlement:

> In evaluating the fairness of a settlement, this court must determine only that sufficient compensation is being paid to the class, and need not speculate as to the appropriate contribution of each defendant. The release of noncontributing defendants through a settlement agreement is no reason for disapproving the compromise.

*Duban v. Diversified Mortgage Investors,* 87 F.R.D. 33, 40 (S.D.N.Y.1980) (citations omitted) (overruling objections that settlement was not fair because "corporation contributed largest share of settlement fund while individually named defendants . . . contributed nothing"). *See also Percodani v. Riker–Maxson Corporation,* 50 F.R.D. 473, 477 (S.D.N.Y.1970) ("the primary interest of the court should be to see that plaintiffs receive what is rightfully owed them in return for relinquishing of legal claims by them. Accordingly, the release of noncontributing defendants through a settlement agreement is no reason for disapproving the compromise"); *Glicken v. Bradford,* 35 F.R.D. 144 (S.D.N.Y.1964) (overruling objections to release of noncontributing shareholders, noting that "the primary interest of the court in approving a settlement resides in" what the plaintiff receives, not in which of the defendants compensates the plaintiff).[7] If the release of even *noncontributing* parties is permissible, then *a fortiori*, the release of additional parties here, who are

---

6. One Class Member, Ms. Sanborn, complains that this indemnity provision "only indemnified McMahon and Clark from materials prepared by AFP. It would not indemnity [sic] for the individual letters prepared by McMahon and Clark," and that McMahon and Clark sent her five personal letters urging her to participate in the sweepstakes. AFE has submitted an uncontroverted declaration that these letters were prepared by AFE, not McMahon and Clark, and are therefore within the scope of the indemnity agreement. Ms. Sanborn also alleges that in 1999, Lead Counsel and AFE's counsel drafted new, more expansive indemnity agreements to benefit McMahon and Clark, which covered "all Ma-

terials prepared or disseminated by" AFE. There is nothing to indicate that Lead Counsel had anything to do with the drafting of these provisions, which were apparently part of McMahon and Clark's periodic promotional contracts with AFE, and are which are no broader in effect than the indemnity provisions which predate this litigation.

7. This also answers the objection of Ms. Sanborn that she was inadequately represented by Lead Counsel because the Settlement Agreement provides for a release of claims against McMahon and Clark.

contributing the *entire* amount of the settlement, poses no obstacle to its approval.

### H. Objection Based on North Carolina Law.

■■■ 48. One Class Member argues that AFE's solicitations violate North Carolina General Statutes §§ 75–32, 75–33, and 75–34, and that under § 75–16, the penalty for these violations is three times the amount of AFE's $11 million grand prize. That is not the remedy these statutes provide. Section 75.16 prescribes the remedy for violations of these other sections, but it is treble the damages suffered, not treble the prize. *See* N.C. Gen.Stat. § 75–16 ("If any person shall be injured . . . by reason of any . . . violation of the provisions of this Chapter, such person . . . shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered . . . for treble the amount fixed by the verdict."); *Ellis v. Smith–Broadhurst, Inc.*, 48 N.C.App. 180, 268 S.E.2d 271, 274 (1980) ("[a]s an essential element of plaintiff's cause of action, plaintiff must prove . . . that plaintiff has suffered actual injury as a proximate result of defendants' misrepresentations"). Accordingly, the damages recoverable by this Class Member under North Carolina law are no different than the damages recoverable by *all* Class Members on their claims under the New Jersey Consumer Fraud Act. *See* N.J.S.A. § 56:8–19 (providing treble damages for violations).

### I. Other Objections.

49. A number of Class Members have objected to the proposed settlement and/or plan of reorganization without stating any basis for their objection. A number of other Class Members have objected on grounds not specifically addressed above, including, without limitation, Class Members expressing concern that the settlement will deprive past grand prize winners of their prizes; alleging that AFE has used their name without permission for promotional purposes; unsupported allegations that the independent judging organization which selects the winners of AFE sweepstakes falsified the winning numbers to deprive a Class Member of their prizes; numerous objections concerning Publishers' Clearing House mailings; and other objections that are either unclear or unintelligible. The Court has considered these other objections and finds that they are without merit, and are therefore overruled.

## VI. APPROVAL, IMPLEMENTATION, AND ENFORCEMENT OF SETTLEMENT

50. The Court hereby approves the terms and provisions of the Settlement Agreement, and finds that it has been entered into in good faith and is fair, adequate, and reasonable as to, and in the best interests of, each of the Parties, the Class Members, and the Subclass Members pursuant to Rule 23 of the Federal Rules of Civil Procedure, and approves the Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. All objections that have been made to the proposed settlement are overruled.

51. In light of the Defendant Parties' inability to satisfy the claims asserted against them, the Court finds that the funds available to Subclass Members from this settlement are substantially greater than the funds, if any, that would be available to Subclass Members in the absence of this settlement. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions. Without limiting the generality of the following—

a. The means for the allocation among Claimants, and the distribution to them, of the *Refund Pool* are found to be fair, adequate, and reasonable, and the Parties are hereby directed to implement them in accordance with the Settlement Agreement;

b. The Automatic Special Sweepstakes is found to be a lawful, reasonable and

appropriate means to distribute a portion of the Consumer Fund to Subclass Members, and the Defendant Parties are hereby directed to implement it in accordance with the Settlement Agreement;

c. The injunctive relief provided in the Settlement Agreement is found to be reasonable, appropriate, and of substantial continuing benefit to the members of the Class, and to the public at large, to reform and correct the practices that the plaintiffs in the MDL Litigation and the Attorneys General have alleged to be deceptive or misleading, and the Defendant Parties are hereby directed to comply with it; and

d. The Claims Administrator is directed to pay all otherwise eligible claims received by the Claims Administrator after May 5, 2000 but on or before August 9, 2000.

52. As set forth in Article VII, Section C of the Settlement Agreement, at the sole discretion of the Defendant Parties and without further approval of this Court, the Defendant Parties may implement the provisions of Article VII of the Settlement Agreement at any time after entry of this Final Order and Judgment, but reserve the right to refrain from doing so until after all conditions to the effectiveness of Article VII have been satisfied.

53. The Claims Completion Date for purposes of determining AFE's liability for certain guaranteed amounts due to the residents of various States pursuant to agreements with State Attorneys General shall be the first business day that is at least thirty (30) days after the commencement of distribution of the Refund Pool.

54. The terms of the Settlement Agreement and of this Final Order and Judgment shall be forever binding on, and shall have res judicata and preclusive effect in, all pending and future lawsuits maintained by the Class Representatives and all other Class Members and Releasing Parties as set forth in Article IX of the Settlement Agreement.

55. The Release which is set forth in Article IX of the Settlement Agreement is incorporated herein in all respects and is effective as of the date of this Final Order and Judgment to forever release and discharge the Released Persons (as defined below) from all Released Claims (as defined below) of the Releasing Persons (as defined below) and bar the Releasing Persons from commencing, continuing, maintaining or asserting any of the Released Claims against any of the Released Persons in any judicial, arbitral, regulatory, administrative or other forum in any jurisdiction. Such Release is an essential, non-severable term of the Settlement Agreement.

As used herein—

a. "Affiliate," as to AFE, means Mailist Associates, MA and Merchandise Associates. "Affiliate," as to TAF or AFPA, means any Person which, directly or indirectly, controls, is controlled by or is under common control with, or ever controlled, was controlled by or was under common control with, TAF or AFPA, respectively. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be controlled by another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise. As to AFPA, "Affiliate" also includes the lineal descendants of Nicholas J. Pritzker, deceased, trusts for their benefit and Persons controlled by such descendants and/or such trusts.

b. "Defendants" means the following persons or entities, or certain of them: AFE; MA; TAF; AFPA; Time, Inc., a Delaware corporation; Time Warner, Inc., a Delaware corporation; Warner Communications, Inc., a Delaware corporation;

Time Customer Service, Inc., a Delaware corporation; AFP Associates, a Delaware general partnership; Richard Clark, an individual; Olive Enterprises, Inc., a Pennsylvania corporation; Ed McMahon, an individual; and any other Released Person that is a defendant in the Litigation.

c. "Person" means any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, company, estate, unincorporated organization, government or any agency or political subdivision thereof.

d. "Released Claims" means all actions, obligations, liabilities, causes of action, suits, counterclaims, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, admiralty or equity, including (without limitation) claims of the kind mentioned in the footnote hereto and claims for compensatory, special, statutory or punitive damages and for costs, expenses and fees, whether known or unknown, suspected or unsuspected, choate or inchoate, which any of the Releasing Persons ever had, now has or hereafter can, shall or may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of the entry of the Preliminary Approval Order which (a) relate directly or indirectly to, or arise from or in connection with, the conduct, promotion, techniques, solicitations, mailings, and practices and administration of AFE-related sweepstakes, including the AFP Solicitation Materials, or the marketing, billing, refunding and other financial and business practices of AFE and/or any of its Affiliates and/or their predecessors or any of the other Released Persons relating to AFE and/or its Affiliates or (b) were asserted in any Litigation.

e. "Released Persons" means any or all of the following Persons: all of the Defendants; AFE and all of its Affiliates; TAF and all of its Affiliates; AFPA and all of its Affiliates; the past, present and future officers, directors, partners, shareholders, members, employees, agents, trustees, legal representatives, insurers and attorneys of all of the foregoing; and the heirs, executors, administrators, successors and assigns of all of the foregoing.

f. "Releasing Persons" means, collectively, any or all of the following Persons: the Class Representatives; the Class Members; the past, present and future officers, directors, partners, shareholders, members, employees, agents, trustees, legal representatives, insurers and attorneys of all of the foregoing; and the heirs, executors, administrators, legal representatives, successors and assigns of all of the foregoing, in each case whether such Person is acting as an individual, a member or representative of a class or as a private attorney general.

56. Unknown Claims Released.

a. Class Representatives, acting on behalf of themselves and each Class Member hereby, have expressly waived and released any and all provisions, rights and benefits conferred by California Civil Code § 1542 (or by similar legal provisions in other states), which reads:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY

AFFECTED HIS SETTLEMENT WITH THE DEBTOR;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542. Class Representatives and each Class Member may hereafter discover facts other than or different from those which he or she knows or believes to be true with respect to the Released Claims and, if known by him or her, might have affected his or her decision to grant the Release contained in the Settlement Agreement, but Class Representatives and each Class Member have expressly waived and fully, finally and forever settled and released any known or unknown, suspected or unsuspected, contingent or non-contingent claim with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

b. Class Representatives, acting on behalf of themselves and each Class Member, have specifically waived any rights they may have under Louisiana Civil Code Article 3083 (or any other comparable federal or state law), including but not limited to any purported right to challenge the validity or seek the rescission of, or to vitiate, the Settlement Agreement on the ground that any information was kept concealed from any of the Class Representatives or Class Members by any of the Released Persons, any right to rescind the Settlement Agreement having been expressly waived.

57. All Class Members are permanently barred and enjoined from, directly or indirectly, filing, commencing, prosecuting, maintaining, intervening in, or participating in (as class members or otherwise) any lawsuit, claim, demand, or proceeding in any jurisdiction that is based on or related to the Released Claims, or the facts and circumstances related thereto, or the *Master Complaint;* and all persons are permanently barred and enjoined from organiz-ing or soliciting the participation of Class Members into a separate class for purposes of filing, commencing or prosecuting a lawsuit as a class action in any jurisdiction (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) that is based on or related to the Released Claims, or the facts and circumstances related thereto, or the *Master Complaint.*

58. This Final Order and Judgment, the Settlement Agreement, any document referred to herein, any action taken to carry out this Final Order and Judgment, any negotiations or proceedings related to any such documents or actions, and the execution and implementation of the Settlement Agreement, shall not be construed as, or deemed to be evidence of, an admission or concession with regard to any fault, wrongdoing or liability whatsoever, and shall not be offered or received in evidence in any action or proceeding in any court, administrative agency or other tribunal for any purpose whatsoever, other than as evidence of the settlement or to enforce the provisions of this Final Order and Judgment and the Settlement Agreement; provided, however, this Final Order and Judgment and the Settlement Agreement may be filed only by any of the Released Persons in any action against or by any of the Released Persons to support a defense of res judicata, collateral estoppel, release, good faith settlement, or judgment bar or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

59. This Court hereby dismisses on the merits and with prejudice, without attorneys' fees or costs to any party except as provided herein, all of the individual claims, class claims, and private attorney general claims alleged in the *Master Complaint* and other actions pending before the Court as part of the MDL Litigation (a list of which is attached hereto as Exhibit A), and each of those actions are hereby

dismissed on the merits and with prejudice.

60. The enforcement of the injunctive relief set forth in Article VII of the Settlement Agreement shall be governed by an objective "reasonable person" standard. Accordingly, for the purposes of the interpretation and enforcement of such provisions, the Court shall apply the standard of review adopted by the Federal Trade Commission in *In Re Cliffdale Assoc., Inc.,* 103 FTC 110, 165 (1982); 1983 Policy Statement, 4 Trade Reg. Rep. (CCH) & 13,205 at 20,913 (*i.e.,* whether the challenged conduct, under the circumstances, is likely to mislead reasonable consumers).

61. The provisions of this Final Order and Judgment may be enforced on motion by any Class Member; provided, however, that prior to filing such a motion, the Class Member or his or her counsel must confer with Lead Counsel (or other such counsel as may be appointed by the Court) regarding the alleged violation, as set forth below:

a. If Lead Counsel determine that the Class Member's allegations have sufficient merit, Lead Counsel shall provide written notice of any alleged violation of this Settlement Agreement to Defendant Parties' counsel, as provided below. The written notice shall set forth with reasonable specificity the conduct alleged to be in violation of this Settlement Agreement, and the specific provision which is alleged to be violated. Upon receipt of the written notice by Defendant Parties' counsel, Defendant Parties shall have a period of thirty (30) days from their receipt of the notice within which to respond to the notice and/or attempt to resolve the violation;

b. If Lead Counsel determine that the Class Member's allegations lack sufficient merit, they shall so inform him or her in writing, and the Class Member may thereafter present the dispute to the Court or a mediator, as provided herein, through other counsel or pro se. A determination by Lead Counsel that the Class Member's allegations lack sufficient merit shall not be discoverable, admissible, or entitled to any weight in any such proceedings before the Court or a mediator, except that on request of the Class Member, Defendant Parties, or the Court or a mediator, Lead Counsel shall certify to the Court or a mediator that the prerequisites to the initiation of such proceedings by the Class Member have been satisfied. In this circumstance, the Class Member shall follow the procedures set forth for Lead Counsel in paragraph (a), above;

c. If Defendant Parties have not responded to the written notice within thirty (30) days of its receipt, and/or have not within this period resolved the alleged violation to the satisfaction of Lead Counsel or the Class Member, as the case may be, the dispute may be submitted to non-binding mediation upon the request of either party. The parties shall agree on a mutually acceptable mediator. The mediator shall make no findings, but rather, try to facilitate a settlement and then report that a settlement has or has not been reached. If a Class Member pursuing his or her own claim of a violation demonstrates that he or she cannot afford to pay the fees and expenses of a mediator, Defendant Parties have the option of paying the costs of a mediator. Otherwise, the Class Member may file the claim of violation with the Court;

d. If Lead Counsel or the Class Member, as the case may be, and Defendant Parties' counsel cannot resolve the alleged violation of this Settlement Agreement by way of the procedures outlined above in paragraphs (a) and (c), Lead Counsel may represent the Class Member, or the Class Member pursuing his or her own claim may act, in presenting the dispute to the Court upon thirty (30) days notice to Defendant Parties' counsel;

e. The Court, in its discretion, may award attorneys' fees and costs to the prevailing party.

62. The Claims Administrator is hereby authorized to perform the tax-related

functions set forth in Article XIV, Section E of the Settlement Agreement.

63. The Parties shall return or destroy documents designated as "Confidential Information" in accordance with the terms of the Court's October 21, 1998 Protective Order.

64. In the event that the settlement does not become effective in accordance with the terms of the Settlement Agreement or in the event that the Settlement Agreement terminates in accordance with Article XI thereof, then this Final Order and Judgment and the order of class certification and other terms herein, shall be rendered null and void and be vacated, and the fact of its existence shall not be offered or accepted into evidence in any court for any reason.

IT IS SO ORDERED.

## EXHIBIT A

BUSINESS PRACTICES LITIGATION: MDL FEDERAL CLASS ACTION

| NAMED PLAINTIFF(S) | NAMED DEFENDANT(S) | CASE NO.(S) | TRANSFEROR JURISDICTION |
|---|---|---|---|
| Dorothy Jackson<br>Helena Stachula<br>Ina V. Brown<br>Hilda Moliere<br>Priscilla Young<br>June G. Hardesty<br>Brian Johnson<br>Perry Land | American Family Enterprises, Magazine Associates f/k/a American Family Publishers, Time Inc. TIHE, TAF, TCS, AFP Associates, and AFP Associates, LLC, Richard Clark and Ed McMahon | Master Case No. 2:98cv03850 and MDL No. 1235. MDL Consolidated Amended Complaint. All Plaintiffs still maintain separate actions, except Johnson and Land. | USDC, D N.J. |
| John Allen | American Family Enterprises d/b/a American Family Publishers; TCS, Ed McMahon, Dick Clark | Case No. 3:98cv00349<br>MDL No. 2:98cv03853 | USDC, D Conn. |
| Kweku Amonoo<br>Vincent Sykes | American Family Enterprises, American Family Publishers d/b/a Magazine Associates, TCS, Ed McMahon, Dick Clark | Case No. 1:98cv00405<br>MDL No. 2:98cv003867 | USDC, SD N.Y. |
| Ruthie Best | American Family Publishers | Case No. CS–98–0139<br>MDL No. 98cv03872 | USDC, D Wash. |
| Ina V. Brown<br>Daniel J. Gibby | American Family Publishers | Case No. 98–122–cv–T–25B<br>MDL No. 98cv03855 | USDC, MD Fla. |
| Kwesi DeGraft–Hanson | American Family Enterprises, American Family Publishers d/b/a Magazine Associates, TCS, Ed McMahon, Dick Clark | Case No. 1:98cv01236<br>MDL No. 2:98cv03858 | USDC, ND Ga. |
| Anna Marie<br>Jeffrey Duttweiler<br>Linda Duttweiler | American Family Publishers, Docs 1–10, XYZ Corporations, Partnerships and/or Other Entities 11–20 | Case No. CV–N–98–00247<br>MDL No. 98cv03866 | USDC, D Nev. |
| Albert F. Dix | Publishers Clearing House, American Family Publishers, Does 1–100 | Case No. 2:98cv01818<br>MDL No. 2:98cv03852 | USDC, CD Cal. |
| Robert H. Herren, Jr.<br>Edgar C. Gentle, Jr. | American Family Enterprises | Case No. CV–98–0292<br>MDL No. 986cv03851 | USDC, ND Ala. |
| Michael Hoy<br>Timothy James Watkins | American Family Publishers, American Family Enterprises, Time Inc., Publishers Clearing House, Inc., National Magazine Exchange, Special Data Processing Corp., The Readers Digest Association | Case No. 99CV 204620<br>MDL No. 99cv3965 | USDC, ED Mo. |
| Phill Ingram<br>Nancy Ingram | Publishers Clearing House, American Family Publishers | Case No. Civ 98–0350<br>MDL No. 98cv03865 | USDC, D N.M. |
| Dorothy Jackson<br>Ruth Kleinman<br>Morton Kleinman<br>Gene Loielo | American Family Enterprises, Time Inc., Time Inc. Home Entertainment, TCS, Park Avenue Publishing Corp., American Family Publishers Associates, LLC. | Case No. 2:98cv03850<br>MDL No. 2:98cv01653 | USDC, D N.J. |

| Billy R. Landers Phylisa Jewel Edwards | American Family Publishers, Reader's Digest Association, Inc., Publishers Clearing House | Case No. CV–98–HGD–2223 MDL No. 98cv5018 | USDC, ND Ala. |
|---|---|---|---|
| Steven Lent | American Family Enterprises, American Family Publishers d/b/a Magazine Associates, TCS, Ed McMahon, Dick Clark | Case No. 1:98cv10712 MDL No. 2:98cv03861 | USDC, D Mass. |
| Hilda Moliere Karen Villafranco Robert Ybarzabal Ellen Taormina | Time Warner, TCS, Time Warner Enterprises d/b/a American Family Publishers | Case No. 2:98cv00944 MDL No. 2:98cv03859 | USDC, ED La. |
| Pam Moorer | Publishers Clearing House, American Family Publishers | Case No. H–98–0831 MDL No. 98cv03870 | USDC, SD Tex. |
| Lori J. Pyatt Barbara Downing | American Family Publishers, Publishers Clearing House | Case No. 4:98cv00490 MDL No. 98cv03864 | USDC, E.D. Mo. |
| Rania Shawwa Basim Shaath | American Family Publishers, TCS, Ed McMahon, Dick Clark | Case No. 4:98cs00857 MDL No. 2:98cv03871 | USDC, SD Tex. |
| Susan Shuford Mary Jenkins John Silkett | American Family Enterprises, Ed McMahon, Dick Clark | Case No. 1:98cs00885 MDL No. 2:9803854 | USDC, D D.C. |
| Annette Turner | Time Warner, Inc., TCS, Time Warner Companies, Warner Communications, Inc. dba American Family Publishers, Ed McMahon, Dick Clark | Case No. 1:98cv183RG MDL No. 2:98cv03863 | USDC, SD Miss. |
| Priscilla Young | American Family Publishers, TCS, Dick Clark, Ed McMahon | Case No. 9:98cv08185 MDL No. 2:98cv03857 | USDC, SD Fla. |
| Carlyn Zempel Frank Rainier Glenn Harris Cory J. Sys | American Family Enterprises d/b/a American Family Publishers d/b/a TCS, Ed McMahon, Dick Clark | Case No. 0:98cv01095 MDL No. 2:98cv03862 | USDC, D Minn. |

BUSINESS PRACTICES LITIGATION: MDL FEDERAL INDIVIDUAL ACTION

| NAMED PLAINTIFF(S) | NAMED DEFENDANT(S) | CASE NO.(S) | JURISDICTION |
|---|---|---|---|
| Callie Bales | American Family Publishers | Case No.4:98cv132–M MDL No. 98cv4899 | USDC, D Kty. |
| Lee Brown | American Family Publishers | Case No. 99–0205 MDL No. 99cv1118 | USDC, ED La. |
| John S. Burnett | American Family Publishers, Time Inc., Ed McMahon, Dick Clark | Case No. 8:98cv00702 MDL No. 2:98cv04898 | USDC, MD Fla. |
| Doris A. Currie | American Family Publishers, Ed McMahon, Dick Clark | Case No. 1:98cv00281 MDL No. 2:98cv04900 | USDC, SD Miss. |
| Willie Green | American Family Publishers | Case No. 98–6775–Civ. MDL No. 98cv4398 | USDC, SD Fla. |
| Oza B. Jenkins | American Family Publishers, Time Enterprises, Inc., TCS, Time Warner, Inc., Loeb & Loeb | Case No. 1:98cv02475 MDL No. 2:99cv1664 | USDC, SD Fla. |
| Hazel Korus | American Family Publishers, American Family Enterprises | Case No. 98cv2279 MDL No. 98cv5785 | USDC, D Minn. |
| Mrs. Ivan Leidy | American Family Publishers | Case No. 98–831 MDL No. 98cv4901 | USDC, WD Penn. |
| Jason May | American Family Enterprises a/k/a American Family Publishers, Caughman, Does A–Z, Doe Corporations A–Z | Case No. 3:98–564 MDL No. 2:98cv1116 | USDC, D Nev. |
| Pablo Ortiz | American Family Publishers | Case No. 98–6459 MDL No. 98cv03856 | USDC, SD Fla. |
| Lolita Pack | American Family Publishers, Magazine Associates, Dick Clark and Ed McMahon | Case No. 2:99–989 MDL No. 99cv2028 | USDC, ED La. |

| | | | |
|---|---|---|---|
| G.A. Ridpath | Time Inc. Home Entertainment, American Family Publishers Assoc., LLC d/b/a American Family Enterprises a/k/a American Family Publishers | Case No. 2:98cs00447 MDL No. 2:99cv1665 | USDC, ED Wash. |
| Kadja Saldanha | American Family Publishers | Case No. 99–11814 MDL No. 00cv566 | USDC, D Mass. |
| Frank R. Sargent | American Family Publishers | Case No. DKC98–1011 MDL No. 98cv03860 | USDC, D Md. |
| Signe Sevigny Arlene Andresen | American Family Publishers | Case No. 98cv12644 MDL No._____ | USDC, D Mass. |
| David Sosnow | TAF Holdings, Inc. and AFP Associates, LLC., General Partners of American Family Enterprises | Case No. 99–6249– CIV–DIMITROULEAS MDL No. 99cv1802 | USDC, SD Fla. |
| W.C. Spencer | American Family Publishers, Dick Clark, Ed McMahon | Case No. 5:99–821 MDL No. 99cv3591 | USDC, ND Oh. |
| Erskine Levi Wesley | American Family Publishers | Case No. 3:98–1543–10BC MDL No. 98cv4399 | USDC, D S.C. |
| William J. West | Stephen Francis, John Melo, Ralph Anthony, Dale Pennington, Elizabeth Matthews, Robert Charles, Lynn Johnson, American Family Publishers, Ed McMahon, Dick Clark, American Family Publishers Customer Service Enterprises, American Family Publishers Employees, American Family Publishers Enterprises Sweepstakes Printing Industry, Time Warner Inc. Communications Inc. Television Movies Enterprises, Time Inc. Customer Service Telemarketing Enterprises Inc., Time Inc. Magazines Enterprises, Time Incorporation Employees, Shareholders, Directors and Partners, Olive Enterprises Inc., Time Incorporation Home Entertainment Enterprises. | MDL No. 00–cv–2196 | USDC, D N.J. |
| Carolyn D. Williams | American Family Publishers, Dick Clark, Ed McMahon | Case No. 3:98cv00421 MDL No. 2:98cv03869 | USDC, MD Tenn. |
| Michael Zeller | American Family Publishers | Case No. Civ 99–0356 MDL No. 99cv1801 | USDC, D Az. |

### BUSINESS PRACTICES LITAGATION: MDL FEDERAL PRIVATE ATTORNEY GENERAL ACTIONS

| NAMED PLAINTIFF(S) | NAMED DEFENDANT(S) | CASE NO.(S) | JURISDICTION |
|---|---|---|---|
| Elizabeth D. Linen | American Family Publishers, Publishers Clearing House, Ed McMahon, Dick Clark, Stephen Francis, Deborah M. Young, and Marden Kane | Case No. 2:98cv02236 MDL No. 2:98cv05198 | USDC, D S.C. |
| Barry F. Sweet Pamela Sweet | American Family Enterprises d/b/a American Family Publishers, Ed McMahon, Dick Clark | Case No. 6:98cv01186 MDL No. 2:98cv03868 | USDC, D S.C. |